**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **LUCAS WALL** | : | |
| 435 10th St., NE | : | |
| Washington, DC 20002 | : | |
| 202-351-1735 | : | |
| | : | |
|   Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:20-cv-2075-EGS |
| | : | |
| **RELIANCE STANDARD LIFE INSURANCE CO.** | : | Judge Emmet Sullivan |
| Suite 1500 | : | |
| 2001 Market St. | : | **JURY TRIAL DEMANDED** |
| Philadelphia, PA 19103 | : | |
| 267-765-4182; | : | |
| | : | |
| **DAVID BRODNER, M.D.** | : | |
| Suite 208 | : | |
| 8794 W. Boynton Beach Blvd. | : | |
| Boynton Beach, FL 33472 | : | |
| 561-735-8750; and | : | |
| | : | |
| **TAJUDDIN JIVA, M.D.** | : | |
| 2567 Sheridan Dr. | : | |
| Tonawanda, NY 14150 | : | |
| 716-836-1388, | : | |
| | : | |
|   Defendants. | : | |

**SECOND AMENDED COMPLAINT**

**I. PARTIES**

    Plaintiff Lucas Wall resides at 435 10th St., NE, Washington, DC 20002. My phone number is 202-351-1735.

    Defendant Reliance Standard Life Insurance Co. ("RSLI") is a corporation headquartered at Suite 1500, 2001 Market St., Philadelphia, PA 19103. Its phone number is 267-765-4182. RSLI is an insurance company engaged in interstate commerce. It does business in the District of the Columbia. The group long-term

disability insurance policy at issue in this litigation was issued by Defendant RSLI to a D.C.-based nonprofit organization.

Defendant David Brodner is a medical doctor with a principal place of business at Center for Sinus, Allergy, & Sleep Wellness, Suite 208, 8794 W. Boynton Beach Blvd., Boynton Beach, FL 33472. His office phone number is 561-735-8750.

Defendant Tajuddin Jiva is a medical doctor with a principal place of business at Phoenix Rising Sleep Medicine, 2567 Sheridan Dr., Tonawanda, NY 14150. His office phone number is 716-836-1388.

## II. BASIS FOR JURISDICTION & VENUE

This case was originally filed in the District of Columbia Superior Court but was removed by Defendant RSLI to this Court because RSLI asserts it involves a federal question under 28 USC § 1331.

Jurisdiction of this Court is based upon the Employee Retirement Income Security Act ("ERISA") (29 USC § 1001 *et. seq.*). ERISA grants the district court jurisdiction to hear civil actions brought to recover interest on delayed benefit payments, obtain costs and fees, and enjoin any act or practice that violates any provision of law or the terms of a plan. A participant may also seek other appropriate equitable relief to redress such violations and/or to enforce the terms of the plan. 29 U.S.C. § 1132(a)(3).

In this case, the plan is a long-term disability insurance policy underwritten and administered by Defendant RSLI for the employees of the American Association of State Highway & Transportation Officials ("AASHTO"), a nonprofit organization based in the District of Columbia.

Jurisdiction of this Court is also based upon diversity of citizenship under 28 USC § 1332 because the amount at stake is more than $75,000 and none of the parties reside or do business in in the same state.

Plaintiff Lucas Wall is a resident of the District of Columbia. Defendant RSLI has its principal place of business in Pennsylvania. Defendant Dr. David Brodner has his principal place of business in Florida. Defendant Dr. Tajuddin Jiva has his principal place of business in New York.

Venue is proper in this Court as the long-term disability insurance policy at issue was contracted to an employer in the District of Columbia, I reside in the District of Columbia, and I filed my original Statement of Claim in the D.C. Superior Court before this matter was removed by Defendant RSLI to this Court.

(NOTE: Per the Standing Order Governing Civil Cases Before Judge Emmet G. Sullivan (Dkt. 12 at ¶ 7), I have attached a marked copy of all changes to the first Amended Complaint by showing additions in green and deletions in red strikethrough. Pl. Ex. B.)

## III. STATEMENT OF FACTS

1. I was employed by AASHTO in Washington, DC, from June 2008 to March 2012, when I became Totally Disabled due to Non-24-Hour Sleep/Wake Disorder, Hypersomnolence Disorder, and Insomnia Disorder.

2. During my employment with AASHTO, I was covered under a group long-term disability insurance policy issued by Defendant RSLI. Pl. Ex. 1.

3. The policy constitutes an "employee welfare benefit plan" or "welfare plan" as those terms are defined in ERISA, 29 USC § 1002, and are subject to various provisions of that Act, including the enforcement provisions contained in Part 5.

4. I was declared legally disabled due to sleep disorders by a Social Security Administration judge in a ruling issued December 16, 2014, retroactive to March 21, 2012 – the last day I worked for AASHTO. Pl. Ex. 2.

5. I continue receiving Social Security Disability Insurance benefits.

6. I have not worked in any capacity since March 21, 2012.

7. Defendant RSLI approved my claim for long-term disability benefits under the policy April 18, 2016. Pl. Ex. 3.

8.  Defendant RSLI based its approval on an independent medical exam ("IME") performed March 2, 2016, by Dr. Boisey Barnes. Pl. Ex. 4.

9.  Just barely more than a year after approving my claim, Defendant RSLI sent me for another IME August 25, 2017, by Dr. Karen Singleton, despite there being no evidence my sleep disorders had improved.

10. Dr. Singleton concluded I remained Totally Disabled. Pl. Ex. 5. Defendant RSLI continued my benefits as a result of her evaluation.

11. Defendant RSLI notified me January 29, 2020, that it was terminating my benefits. Pl. Ex. 6.

12. Defendant RSLI never sent me for an IME as part of its 2019-20 review of my benefits, despite pledging it would do so. Pl. Ex. 24.

13. Defendant RSLI's termination of my benefits was based in great part on a November 10, 2019, "peer review" of my medical records by Defendant Dr. David Brodner. Pl. Ex. 7. Dr. Brodner never met with me in person or even spoke with me on the phone.

14. Defendant Dr. Brodner claims to be a sleep specialist, but a check of online records indicate he is NOT certified by the American Board of Sleep Medicine. Pl. Ex. 15.

15. I filed an appeal with Defendant RSLI on April 30, 2020, in which I argued for 33 pages that the termination of my benefits was improper and that Defendant Dr. Brodner's report was full of errors and false conclusions unsupported by the record. Pl. Ex. 8. I incorporate all facts stated in my April 30 appeal letter into this Second Amended Complaint.

16. During my appeal, Defendant RSLI never sent me for an IME despite pledging it would do so.

17. Instead, Defendant RSLI commissioned another "peer review" by Defendant Dr. Tajuddin Jiva, which he issued June 8, 2020. Pl. Ex. 9. Dr. Jiva never met with me in person or even spoke with me on the phone.

18. I submitted to Defendant RSLI on July 26, 2020, a rebuttal to the report by Defendant Dr. Jiva that was full of errors and false conclusions unsupported by the record. Pl. Ex. 10. I incorporate all facts stated in my July 26 rebuttal letter into this Second Amended Complaint.

19. At no time in all my medical records on file with Defendant RSLI is there a period where any medical provider deemed that my condition has improved. In fact, the records reveal a continuous course of disability, with sleep logs and data graphs showing only a *worsening* of my sleep disorders since the last IME in August 2017. Pl. Exs. 12 & 13.

20. Defendant RSLI denied my appeal July 29, 2020 – on the 90-day deadline to make a final determination under the policy terms and federal regulations. Pl. Ex. 11.

21. Since Defendant RSLI never sent me for an IME as it had pledged in both 2019 and 2020, I sent a letter July 31, 2020, demanding my appeal be reconsidered and that the promised IME take place. Pl. Ex. 24.

22. Defendant RSLI agreed to reconsider its denial of my appeal and sent me for an IME on August 28, 2020, with Dr. Raam Sambandam, a neurologist in Clermont, Florida (near where my mother resides).

23. Defendant RSLI notified me September 16, 2020: "We have received the final Independent Medical Examination ("IME") report and completed our independent review of your file/the additional information submitted. It has been determined that the Claims Department's original determination to terminate your LTD claim should be reversed at this time. Your file has been referred back to [Examiner] Dana Brown[-Boyer] in our LTD Claims Department for ongoing adjudication." Pl. Ex. 17.

24. Dr. Sambandam's IME report completely contradicted the peer reviews conducted by Defendants Drs. Brodner and Jiva as well as the original finding January 29, 2020, by Defendant RSLI to

terminate my disability benefits effective March 2020 and the first determination on appeal July 29, 2020, to sustain the original finding terminating my benefits. Pl. Ex. 18.

25. I immediately sent Defendant RSLI a demand for prompt payment due to me of $13,918.41 after federal income-tax withholding. Pl. Ex. 19.

26. Defendant RSLI deposited into my bank account $13,702.50 on September 19, 2020, a shortfall of $215.91 in interest due.

27. I filed September 17, 2020, an objection to one paragraph of Defendant RSLI's e-mail informing me it was reinstating my long-term disability benefits. I demanded RSLI revise the letter with five specific paragraphs ensuring I will be protected from its arbitrary and capricious decisionmaking in the future. Pl. Ex. 20.

28. I asked Defendant RSLI to respond by today (September 24, 2020). As of this filing, RSLI hasn't responded to my objection or agreed to the five paragraphs I demanded.

29. I sent Defendant RSLI's counsel a settlement proposal September 17, 2020. Mr. Moore has not responded to initiate settlement talks, therefore I must file this Second Amended Complaint.

30. The administrative record for this case is maintained by Defendant RSLI. It has yet to file that record with the Court. I e-mailed RSLI's counsel September 21, 2020, to inquire when it expects to file the administrative record. Mr. Moore replied he will not file it until after a Scheduling Conference has been held.

31. I filed September 22, 2020, a complaint against Defendant Dr. Brodner with the Florida Department of Health. Pl. Ex. 21. I incorporate all facts stated in my Florida Department of Health complaint into this Second Amended Complaint.

32. I filed September 22, 2020, a complaint against Defendant Dr. Jiva with the New York State Department of Health's Office of Professional Medical Conduct. Pl. Ex. 22. I incorporate all facts

6

stated in my New York State Department of Health complaint into this Second Amended Complaint.

33. I am enrolled in two District of Columbia housing-assistance programs for the poor and disabled, but have not been able to move forward with purchasing a home this year because of defendants' actions. Obtaining a mortgage through these programs requires a minimum income level that I no longer met when RSLI illegally stripped me of my benefits effective March 2020 until restoration this month.

34. I've had to pay a great deal in credit-card interest this year because of Defendant RSLI's actions depriving me of long-term disability income benefits I am entitled to.

35. The financial strain and inability to purchase a home caused by defendants' actions have caused me a great deal of emotional distress, including an episode of suicidal depression August 18-22, 2020.

36. My brother, Justin Wall, is also diagnosed with Non-24-Hour Sleep/Wake Disorder and Hypersom-nolence Disorder. "Along with witnessing Lucas' struggles firsthand, I also suffer from the same conditions myself, so I'm in a unique position to offer insight for your understanding of how disabling Non-24-Hour Sleep/Wake Disorder and Hypersomnolence Disorder are," he wrote. Pl. Ex. 23.


**IV. CAUSES OF ACTION**


**Count I: Demand for Payment of Interest, Costs & Fees, & Judicial Relief to Ensure Continued LTD Benefits under ERISA as Against Defendant RSLI**

37. **IMPROPER TERMINATION OF CONTINUED BENEFITS:** Defendant RSLI terminated my long-term disability benefits, which it had paid me from mid-2012 to February 2020, from March 2020 to September 2020 in violation of the policy terms. RSLI presented no evidence to contradict my

contention that I remain Totally Disabled as my sleep disorders have only worsened since my last claim review in 2017, as demonstrated by my sleep logs and data graphs. Pl. Exs. 12 & 13.

38. Dr. Sambandam confirmed in his report on last month's IME that my sleep disorders have worsened since the last IME I underwent in August 2017. Pl. Ex. 18.

39. Defendant RSLI reversed itself September 16, 2020, overturning its original finding of January 29 to terminate my disability benefits effective March 2020 and the first determination on appeal July 29 to sustain the original finding terminating my benefits. Pl. Ex. 17.

40. The policy's terms constitute a contractual promise to provide specified benefits to participants and beneficiaries pursuant to ERISA for a specified period of time. In my case, that's until I reach the retirement age of 67. Pl. Ex. 1.

41. Defendant RSLI is required by ERISA to fully and fairly review a claim, which it did not on original termination and initial appeal. It granted my claim in 2016, sustained it in 2017, and then terminated it in 2020 without any evidence to overturn its previous two findings. The IME report by Dr. Sambandam proves my assertions. Pl. Ex. 18.

42. I am entitled to continue receiving these benefits until the retirement age of 67 because I have satisfied all conditions to be eligible and have not waived or otherwise relinquished my entitlement to these benefits.

43. The benefits I already received for more than eight years are labeled "long-term disability" for a reason: They are meant to pay for a long-term, lifelong disability such as mine – as Defendant RSLI already agreed in its prior determinations in 2016 and 2017 (and now again in September 2020) to pay me these benefits.

44. **RSLI OWES ME INTEREST ON 6 MONTHS OF ILLEGALLY WITHHELD BENEFITS:** Defendant RSLI has refused to pay me interest on the six months of long-term disability benefits (March to August 2020) it illegally did not pay me until this month. But interest is collectable pursuant to ERISA

common law. RSLI has retained money that rightfully belonged to me as a beneficiary. To allow RSLI to retain the interest it earned on funds wrongfully withheld would be to approve of unjust enrichment.

45. A "beneficiary of an ERISA plan may bring an action for interest on delayed benefits payments under section 502(a)(3)(B)" notwithstanding the lack of an express provision in ERISA to collect interest on wrongly denied benefits. The court based this right on its power to develop common law that "effectuates the statutory pattern enacted by Congress." *Fotta v. Trs. of the UMW Health & Ret. Fund of 1974*, 165 F.3d 209, 211-12 (3rd Cir. 1998).

46. "As a general rule, prejudgment interest is to be awarded when the amount of the underlying liability [can be reasonably ascertained] and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of the money which was legally due." *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3rd Cir. 1992).

47. A beneficiary is entitled to interest for wrongful denial of benefits even when the benefits were later restored by the insurance company before the court could issue a judgment.

48. A court should allow a beneficiary's claim for interest on denied benefits where the benefits were voluntarily restored, even though there was no underlying judgment upon which the court could make an award of "prejudgment interest." The Court of Appeals found that if interest was an appropriate remedy "to avoid unjust enrichment of a plan provider who wrongfully delays the payment of benefits, the award is appropriate whether a judgment is obtained or not." *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1007 (8th Cir. 2004).

49. "[T]he principles justifying prejudgment interest also justify an award of interest where benefits are delayed but paid without the beneficiary's having obtained judgment. The concerns … [about] making the claimant whole and preventing unjust enrichment are not diminished merely because the plan has paid the overdue benefits without the claimant having [prevailed in] litigation to

secure payment. A late payment of benefits effectively deprives the beneficiary of the time value of his or her money whether or not the beneficiary secured the overdue benefits through judgment as the result of ERISA litigation." *Fotta* at 212.

50. The D.C. Circuit held that prejudgment interest in presumptively available when benefits have been delayed. *Moore v. CapitalCare, Inc.*, 461 F.3d 1, 12 (D.C. Cir. 2006).

51. **MEDICAL EVIDENCE OF CONTINUED DISABILITY:** "The factors contributing to N24SWD in sighted individuals are chronic." Pl. Ex. 14.

52. "[T]reatment of individuals with N24SWD is particularly challenging and often unsuccessful. Once he was diagnosed with N24SWD, [Plaintiff] LEW was treated with melatonin, light therapy, and off-label Tasimelteon (Hetlioz®), among other therapeutic trials, all without success." *Id.*

53. Defendant RSLI acted in an arbitrary manner in relying on "peer reviews" of my medical records by Defendants Drs. Brodner and Jiva – who never examined me in person or even spoke to me on the phone – over the opinions of doctors who actually treated me as well as the two doctors who conducted IME's of me in 2016 and 2017 at RSLI's behest.

54. Defendants Drs. Brodner and Jiva never examined my sleep logs and data graphs (Pl. Exs. 12 & 13) – the most critical documents when reviewing whether someone suffers from Non-24-Hour Sleep/Wake Disorder and Hypersomnolence Disorder. Pls. Ex. 7 & 9. Dr. Jiva even proclaimed I didn't keep sleep logs! Pl. Ex. 9. Defendant RSLI failed to appropriately respond to this unbelievable inaccurate assertion by Dr. Jiva, nor Dr. Brodner's failure to review my sleep logs and data graphs.

55. As part of a "full and fair review," ERISA regulations require that a review "takes into account all comments, documents, records, and other information submitted by the claimant …" 29 CFR § 2560-503(h)(2)(iv).

56. Defendant RSLI's reliance on overutilized paper reviewers who never met with me or spoke with me on the phone, failure to take into the account the entirety of the medical record, failure to review my sleep logs and data graphs, and failure to address the combination of my impairments is clearly arbitrary and capricious.

57. "[I]t must be clear that the independent medical reviewer rendered a decision that is 'reliable.' *Black*, 538 U.S. at 834. … We think a 'reliable' opinion is one that includes an examination of all pertinent evidence. Here, however, we cannot conclude that Dr. Dean grappled with the evidence concerning Ms. Marcin's partial disability." *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir. 2017).

58. "In the case of [Plaintiff] LEW, independent medical reviewers were appointed by his insurance company in 2019 [Dr. Brodner] and 2020 [Dr. Jiva] to review his disability claim, but none of these physicians are qualified to issue an opinion on this orphan disease." Pl. Ex. 14.

59. Only when Defendant RSLI finally sent me for an IME on August 28, 2020 – 30 days after the 90-day deadline for issuing a final determination on my administrative appeal – did it finally have to face the music and accept the third independent doctor's agreement that my conditions have worsened and are not expected to improve. Pl. Ex. 18 (*see also* prior two IME reports at Pl Exs. 4 & 5.)

60. "The information [Mr. Wall] provided [at the August 28 IME] was consistent with the medical records provided. … He notes that his condition has worsened over the past 8 years. … Mr. Wall is unable to maintain a regular job given his abnormal sleep/wake cycle. His severe sleep disturbances result in excessive daytime hypersomnolence and mild psychological distress. Mr. Wall can sleep in excess of 3-4 days [of normal sleep] at time and may fall asleep at any point in a 24 hour day." Pl. Ex. 18.

61. Courts should give more weight to the opinion of a doctor who has actually examined a person over the insurance company's file-reviewing doctors. When it terminated my benefits, Defendant RSLI failed to appropriately consider the opinions of my treating physicians as well as the independent doctors who examined me in 2016 and 2017 – both of whom issued reports favorable to my disability claim. Pl Exs. 4 & 5.

62. "Taking into consideration what is scientifically known about N24SWD, its pathophysiology in sighted individuals, and possible therapeutic approaches, it is safe to assume that [Plaintiff] LEW has undergone and failed all therapeutic possibilities for N24SWD, thus proving to be therapy refractory." Pl. Ex. 14.

63. Many sighted Non-24 patients are permanently disabled as there is no treatment or cure for the disorder.

64. As another sufferer of Non-24-Hour Sleep/Wake Disorder, Robin Stewart, posted recently in an online support group: "I try to explain to people and doctors who don't understand that [having Non-24] is like being an amputee. You don't expect your limb to just grow back, you accept that[] it's gone and you do what you can to move on with the life you have now[,] with the accommodations you need. … I don't expect my sleep to change back or the life I had before I had N24 to come back but I do what I can to live my life as normally as I can in my new normal." Pl. Ex. 16.

65. "Given that no new therapies have been developed for N24SWD since [Plaintiff] LEW's last therapeutic trial with Tasimelteon (Hetlioz®), and that no cure has thus been developed for N24SWD, termination of any insurance benefits cannot be supported by medical evidence." *Id*.

66. "In sum, considering that [Plaintiff] LEW was diagnosed with N24SWD, an orphan condition described in approximately 100 sighted patients, with no treatment guidelines for sighted individuals, no FDA approved therapies for sighted people, no known cure, and a largely unknown

natural history; and that he was declared disabled because of said condition, termination of any insurance benefits cannot be supported by any scientific evidence." *Id*.

67. In its July 29 letter denying my appeal (Pl. Ex. 11), Defendant RSLI failed to refute numerous arguments and supplemental information that I submitted. *See* my appeal letters at Pl. Exs. 8 & 10. (Note: I submitted 57 exhibits to RSLI during this year's appeal in addition to the 57 exhibits I submitted in 2015-16 during the initial claims review and appeal, for a total of 114 exhibits.)

68. When an insurance company fails to refute arguments and supplemental information submitted made by a claimant, the Court should treat those matters as conceded.

69. A claim denial/termination must address evidence favorable to the claimant "thoughtfully and at length." *Evans v. Eaton Corp.*, 514 F.3d 315, 323 (4th Cir. 2008).

70. An insurer's decision is not reasonable if it ignores the beneficiary's treating physician opinions while deferring to its own independent experts that fail to properly perform an assessment of a claimant's work abilities and ignore material records submitted such as sleep logs and data graphs showing a condition is worsening, not improving or even stabilizing.

71. "[W]hile Reliance was not obligated to accord special deference to Ms. Marcin's physicians, its 'selective description of the medical evidence further undermines the reasonableness of its decision.'" *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir 2017).

72. **DISAGREEMENT WITH SOCIAL SECURITY ADMINISTRATION:** Defendant RSLI's decision to terminate my long-term disability benefits directly contradicted the legal judgment of the Social Security Administration that I am Totally Disabled.

73. Where an administrator encourages a beneficiary to apply for Social Security Disability benefits and directly profits from the award of those benefits by reducing payments owed to beneficiaries (such as in this case), the claim administrator's failure to consider the agency's finding of disability may bear on the propriety of its decision to deny of terminate benefits. *Metropolitan Life Ins. Co.*

*v. Glenn*, 554 U.S. 105, 118 (2008); *see also Elliott v. Sarsah Lee Corp*, 100 F. Supp.2d 458, 468 (W.D.Va. 2000).

74. "The Court finds that it cannot defer to Reliance's decision to deny benefits as reasonable, given Reliance's failure to address, or even to acknowledge, the Social Security Administration's May 28, 2010, determination that plaintiff had been disabled since August 20, 2007." *Marcin v. Reliance Standard Life Ins. Co.*, No. 13-cv-1308, Dkt. 43 at 10 (D.D.C.)

75. "[A]n SSA determination, though certainly not binding, is far from meaningless." *Id.* at 10-11, quoting from *Wooden v. Alcoa, Inc.*, 511 F. Appx 477, 484 (6th Cir. 2013).

76. "[I]t might be unreasonable for an insurer 'to ignore a favorable SSA decision' that has already been rendered." *Id.* at 11, quoting from *Brown*, 12. F.Supp. 3d at 99 n. 20.

77. **DISAGREEMENT WITH PREVIOUS RSLI DETERMINATIONS:** The cumulative medical records, including my sleep logs and data graphs kept at the direction of sleep specialists since 2009, reveal there has never been any improvement in my conditions. They have only gotten worse since Defendant RSLI approved my claim in 2016 and sustained my benefits in 2017.

78. Dr. Sambandam confirmed this in his report of my August 28, 2020, IME: "On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

79. An administrator must give a reasoned explanation for why a beneficiary is subsequently denied benefits following an initial approval. *Anderson v. Reliance Standard Life Ins. Co.*, 2013 WL 1190782 (D.Md. 2013); *Patel v. United of Omaha Life Ins. Co.*, 2013 WL 212863 (D.Md. 2013).

80. Similarly, it has been held that "reversal of a decision of disability may warrant significant skepticism when substantial evidence does not support the conclusion that disability has ceased." *Smith v. Continental Cas. Co.*, 276 F.Supp.2d 447, 460 (D.Md. 2003), *vacated on other grounds*,

369 F.3d 412 (4th Cir. 2004). *See also Ulsaker v. Lincoln Nat. Life Ins. Co.*, 2011 WL 4621030 (E.D.Va. 2011).

81. **VIOLATION OF ERISA:** Defendant RSLI's action terminating my long-term disability benefits from March to September 2020 without cause constitutes a violation of ERISA.

82. Although Defendant RSLI has now belatedly partially remedied that violation by paying me the benefits I was due from March to September 2020, I demand equitable relief under ERISA to ensure this illegal action never happens in the future and to compensate me for the damages I have incurred because of the illegal act.

83. Defendant RSLI deliberately, intentionally, in bad faith, and without legal justification or excuse denied me for six months the benefits conferred by the express terms of the plan – benefits it had already paid for me since 2012.

84. Defendant RSLI has a duty to ensure that the plan is administered in accord with its terms.

85. Defendant RSLI breached its duty.

86. I have been harmed thereby.

87. Defendant RSLI is likely to breach its duty again in the future.

88. I would be irreparably harmed by any similar future breach.

89. The actions of Defendant RSLI as stated herein constitute actionable violations of ERISA for which equitable and other relief is available from this Court.

90. Under ERISA § 404(a), a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of: … providing benefits to participants and their beneficiaries … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims … in accordance with the documents and instruments governing the plan." 29 USC § 1104(a)(1).

91. Defendant RSLI has failed to demonstrate that its decision to terminate my long-term disability benefits was the result of a deliberate, principled, and reasonable process.

92. There is great danger Defendant RSLI will repeat its conduct in future years as it has a profit motive to terminate my long-term disability benefits.

93. Its past conduct show the Court that Defendant RSLI can be expected to act again in the future to end my benefits without just cause.

94. **ADMINISTRATIVE REMEDIES EXHAUSTED:** As of July 29, 2020, I exhausted all administrative remedies under the plan when the 90-day deadline to make a final determination on my appeal lapsed.

95. Defendant RSLI has argued to the contrary because my administrative appeal denial was being reconsidered.

96. However, now that my final appeal determination was made September 16, there can't be any dispute as to this material fact that I have exhausted all administrative remedies. Pl. Ex. 17.

97. **RIGHT TO SUE:** ERISA permits the beneficiary of an employee welfare benefit plan to sue for a judgment as to: A) *entitlement to* past and *future benefits*; B) recover benefits due him under the terms of the plan; C) *enforce his rights under the terms of the plan*; D) *clarify his rights to future benefits under the terms of the plan*; and E) *for other appropriate equitable or legal relief*. 29 USC § 1132 (emphasis added noting those that apply to my causes of action).

98. ERISA § 502(a)(3) also provides that a participant may seek to enjoin any act or practice that violates any provision of law or the terms of the plan. A participant may also seek other appropriate equitable relief to redress such violations and/or to enforce the terms of the plan. 29 U.S.C. § 1132(a)(3).

99. "The term 'other appropriate equitable relief' implies a broad range of remedies. We adhere to the principle 'endorsed repeatedly ... by the federal judiciary' that 'when Congress uses broad

generalized language in a remedial statute, and that language is not contravened by authoritative legislative history, a court should interpret the provision generously so as to effectuate the important congressional goals.' *Cia Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 428 (1st Cir. 1985) (footnote omitted). One of the important goals of ERISA is to make certain that participants and beneficiaries not be deprived of the full value of their plan benefits by a fiduciary's breach of a contractual duty." *Warren v. Society National Bank*, 905 F.2d 975 (9th Cir. 1990).

100.  "The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action." 29 U.S.C. § 1132(f).

101.  **RIGHT TO COSTS & FEES:** "In any action under this subchapter … by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 USC § 1132(g)(1).

102.  To be entitled to attorney's fees, the Supreme Court held (in a case that involved Defendant RSLI) that a party need only establish "some success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010).

103.  In deciding to make a decision terminating benefits it had already paid me for almost eight years, Defendant RSLI was influenced by its financial conflict of interest, based on its funding of the benefits that should be continued.

104.  Defendant RSLI enriched its own coffers to my detriment through the wrongful termination of benefits.

105.  If I elect to continue proceeding *pro se*, RSLI should pay fees to me in lieu of an attorney for the time I have spent litigating this matter.

106.  **STANDARD OF REVIEW:** The appropriate standard of review in this case is  *de novo*.

107.  Because Defendant RSLI both determines eligibility for benefits under the policy and pays such benefits, it acts under a conflict of interest. "There is an actual, readily apparent conflict here, not a mere potential for one" when the insurance company acts both as plan administrator and ultimately pays the benefits. *Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, 527 (6th Cir. 2003), quoting from *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998).

108.  The Supreme Court held in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2243 (2008) that where a plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pockets," that dual role creates a conflict of interest.

109.  "Importantly, however, there is an inherent conflict of interest that arises when a plan administrator both evaluates claims for benefits and pays those benefits. *Glenn*, 554 U.S. at 112. The Supreme Court has explained that this conflict of interest is a 'factor' to be considered and that 'any one factor will act as a tiebreaker when the other factors are closely balanced.' *Id.* at 117." *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir. 2017).

110.  "While the factors to be examined in any ERISA case will vary based on the factual circumstances, *Glenn* makes it clear that the conflict of interest factor must be evaluated alongside these other determinations. Thus, when reviewing the lawfulness of Reliance's decision to deny disability benefits, we must remember the conflict of interest factor and weigh it appropriately." *Id*.

111.  An inherent conflict of interest exists when an insurer both determines plan eligibility and issues benefits, creating a "perpetual conflict with [a] profit-making role as a business." *Pinto vs. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 384 (3rd Cir. 2000). *See also Lemaire v. Hart Life & Accident Ins. Co.,* 69 F. Appx 88, 91 (3rd Cir. 2003); *Evans v. Metro. Life Ins. Co.*, 358 F.3d 307, 311 (4th Cir. 2004); *Anderson v. Cytec Indus.,* 619 F.3d 505 (5th Cir. 2010); *Schwalm v. Guardian Life Ins. Co. of*

*Am.*, 626 F.3d 299, 311 (6th Cir. 2010); *Murphy v. Deloitte & Touche Grp. Ins. Plan,* 619 F.3d 1151

(10th Cir. 2010); and *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1552 (11th Cir. 1994).

112.  When a court finds a conflict of interest, it must review decisions *de novo. Armstrong v. Aetna Life Ins. Co.*, 128 F.3d 1263, 1265 (8th Cir. 1997).

113.  When a court considers a denial or termination of benefits *de novo*, the examining court interprets the governing plan documents without any deference to interpretation by the insurance company. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989).

114.  Even under the less-rigorous "deferential review" standard that does not apply in this case, courts have held that the plan administrator's determination must be supported by substantial evidence to be sustained. *Buzzard v. Holland*, 367 F.3d 263, 268-69 (4th Cir. 2004).

115.  In this case, Defendant RSLI did not present ***any*** evidence showing that my sleep disorders improved since my claim was granted in 2016 and sustained in 2017 after IME's. In fact, they worsened.

116.  As Dr. Sambandam concluded in his report of my August 28, 2020, IME: "On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

117.  "The insurer should not be permitted to profit by its own wrong." *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 202 (Cal. 1958).

118.  **CONGRESSIONAL INTENT:** Congressional intent is for courts to fashion remedies for ERISA violations that not only protect participants and beneficiaries but deter violations of the law as well. H.R. REP. 101-386 at 433 (1989) (Conf. Rep.), reprinted in 1989 U.S.C.C.A.N. 3018, 3036, cited in *Kifafi v. Hilton Hotels Retirement Plan*, 701 F.3d 718, 728 (D.C. Cir. 2012).

**Count II: Bad Faith as Against All Defendants**

119.  **GENERAL DEFINITIONS:** Bad faith is dishonesty or fraud in a transaction. It might involve an intent to deceive or mislead another in order to gain some advantage. It is often related to a breach of an obligation inherent in all contracts to deal with the other parties in good faith and with fair dealing, such as in timely paying claims due under an insurance policy.

120.  Bad faith describes a tort claim that an insured person has against an insurance company for its bad acts. Insurance companies owe a duty of good faith and fair dealing to the persons they insure. This duty is often referred to as the implied covenant of good faith and fair dealing. This exists by operation of law in every insurance contract. If an insurance company violates that covenant, the insured person has a claim for bad faith. A plaintiff in an insurance bad-faith case may be able to recover an amount larger than the original face value of the policy if the insurance company's conduct was particularly egregious.

121.  Insurance companies are required by law to act in good faith and deal fairly with policyholders. They must do so by following through on the agreed-upon duties they have promised to beneficiaries, since they entered into a contract (policy) with them. This includes the duty of paying claims and doing so promptly. If an insurance company does not comply and breaches its duty, its acts are dishonest and deceptive, and considered to be bad faith.

122.  An insurance company acts improperly, or in bad faith, when handling a claim when it, among other actions: A) fails to adequately investigate a claim; and B) terminates benefits it has already been paying without substantial evidence that the beneficiary no longer meets the policy's terms for continual coverage.

123.  "The bad faith tort is grounded on the covenant of good faith and fair dealing that is implicit in all contracts, supplemented by the idea that insurance contracts have special characteristics that warrant heightened liability for breach of that covenant. *See Braesch v. Union Ins. Co.*, 237 Neb.

44, 464 N.W.2d 769, 774-75 (1991) (noting the unique 'public interest' character of the insurance industry, the fact that an insured seeks to protect against loss rather than gain commercial advantage, and the unequal bargaining power of insurers and insureds); *see also Kranzush v. Badger State Mut. Casualty Co.*, 103 Wis.2d 56, 307 N.W.2d 256, 261 (1981) ('The heart of the [bad faith] tort … is the fiduciary relationship between the insurer and the insured and the insurer's breach of the duty of good faith and fair dealing implicit in every contract.')." *Messina v. Nationwide Mut. Ins. Co.,* 998 F.2d 2 (D.C. Cir. 1993).

124. **RSLI's PRIOR ACTS OF BAD FAITH:** A defendant's prior acts of bad faith enlighten the examination of any current cause of action for similar misconduct.

125. Defendant RSLI has a poor track record in the federal courts of exhaustively litigating against disability claimants but losing – sometimes accruing many more times in attorneys' fees and costs than what it should have paid to the beneficiaries in the first place.

126. Defendant RSLI litigated my claims before this Court from July 30 to September 16, even filing a Motion to Dismiss Plaintiff's Claims (Dkt. 3), before reversing itself and paying my past-due benefits from March to September 2020 on September 19. Such an action shows how RSLI's posture in this litigation has been in bad faith, as were its January 29, 2020, and July 29, 2020, decisions to terminate my long-term disability benefits without cause.

127. For two other recent examples in this Court of Defendant RSLI's wrongdoing, see *Marcin v. Reliance Standard Life Ins. Co.*, No. 13-cv-1308 (D.D.C. October 14, 2015) (affirmed No. 16-7125 (D.C. Cir. 2017)), and *Boster v. Reliance Standard Life Ins. Co.*, No. 12-cv-980 (D.D.C. August 8, 2013).

128. *Marcin* is an especially outrageous example of Defendant RSLI's bad-faith dealings with disability beneficiaries. RSLI denied Ms. Marcin's original benefit claim June 11, 2008, then spent more than

seven years battling against her before this Court finally issued a judgment in her favor October 14, 2015.

129.  "[T]he Court finds that the insurer's decision cannot be sustained. The record in this case does not contain substantial support for the insurer's finding that she was capable of working full-time when she stopped working, and that is the basis upon which it denied her claim for benefits." *Marcin* at 2. "[T]he Court finds that Reliance's determination was not reasonable and cannot be upheld." *Id.* at 18. "Reliance's selective description of the medical evidence further undermines the reasonableness of its decision." *Id.* at 22.

130.  RSLI then continued fighting Ms. Marcin, despite the judgment entered against it, resulting in a September 19, 2016, filing informing the Court it would not pay her a penny. *Marcin* at Dkt. 64 "Defendants' Notice of Decision on Remand."

131.  Defendant RSLI appealed to the U.S. Court of Appeals for the District of Columbia Circuit, which affirmed the judgment against it on June 30, 2017 – meaning poor disabled Ms. Marcin had to fight RSLI more than ***nine years*** to obtain the benefits she was entitled to her under policy.

132.  The partial and selective medical reviews undertaken by Defendants Dr. Brodner and Jiva at the behest of Defendant RSLI demonstrates RSLI's ongoing effort to deny benefits by any means necessary – even accepting totally false "peer reviews" as true.

133.  In my case, all four "peer reviews" conducted by Defendant RSLI have been discredited by the three independent doctors who have examined me in person. Pl. Exs. 4, 5, & 18.

134.  Most recently, contradicting all the key findings of Defendants Drs. Brodner and Jiva – which Defendant RSLI relied upon on its wrong decisions to terminate my disability benefits January 29 and again July 29 of this year – Dr. Sambandam concluded: "Mr. Wall cannot function in a routine of any meaningful manner due to the unpredictability of his sleep schedule. Mr. Wall cannot work in a full-time capacity from 11/10/2019 onward." Pl. Ex. 18. (RSLI's selection of November 10,

2019, as a date for Dr. Sambandam to evaluate my conditions is mysterious as this date has no

relevance to my sleep disorders.)

135.  Federal courts have often admonished Defendant RSLI for malfeasance in claim reviews. *See*,

e.g., *Taylor v. Reliance Standard Life Ins. Co.*, 2011 WL 3881488 (W.D.Wash. 2011); *Cyr v. Reliance

Standard Life Ins. Co.*, 2011 WL 3793776 (9th Cir. 2011); *Kochenderfer v. Reliance Standard Life

Ins. Co.*, 2009 WL 47228321 (S.D.Cal. 2009); and *MacLeod v. Reliance Standard Life Ins. Co.*, 2010

WL 597005 (D.N.H. 2010).

136.  **RSLI'S BAD FAITH IN MY CASE:** Defendant RSLI is guilty of particularly egregious bad faith for

failing to properly determine that my sleep disorders have worsened since my claim for long-term

disability benefits was approved in 2016 and reapproved in 2017. RSLI failed to thoroughly

investigate my worsening medical conditions before illegally terminating my claim in January 2020

and upholding that termination six months later on appeal.

137.  Defendant RSLI unreasonably delayed for six months payment of benefits I was due under the

policy, causing me great financial strain, credit-card interest payments, delayed purchase of a

home, and enormous emotional distress, among other injuries.

138.  Defendant RSLI acted in bad faith by pledging twice, in 2019 and again in 2020, to send me for

an IME as part of its ongoing review of my claim and then as part of its initial review of my appeal

– but then never sending me for such an exam until a month after the 90-day deadline for making

a final determination of my appeal. Pl. Ex. 24.

139.  Dr. Sambandam's report of my August 28, 2020, IME makes it crystal clear exactly why

Defendant RSLI didn't want to send me for such an exam. RSLI knew any competent physician

examining me would reach the same conclusion Dr. Sambandam did: "The prognosis is poor in

this case. Mr. Wall cannot function in a routine of any meaningful manner due to the

unpredictability of his sleep schedule. … Mr. Wall cannot work in a full-time capacity from

11/10/2019 onward. On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

140. The claim termination in my case was not the result of a reasoned and principled decisionmaking process. Rather, Defendant RSLI took an unprincipled and irrational course to a predetermined result of benefits denial based on its conflicts of interest. This conduct should result in lessened deference given to the decisions by RSLI as well as the recommendations made by Defendants Drs. Brodner and Jiva.

141. "While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 636 (10th Cir. 2003).

142. "If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006), quoting from *Hais v. Smith*, 547 A.2d 986, 987-88 (D.C. 1988).

143. **INSURANCE & CONTRACT LAW:** State laws regulating insurance are the chief exception to the broad sweep of ERISA's pre-emption requirements. State laws regulating insurance fall under ERISA's "savings clause": "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 USC § 1144(b)(2)(A).

144. The Supreme Court has instructed that the "presumption is against preemption, and we are not inclined to read limitations into federal statutes in order to enlarge their preemptive scope." *Metropolitan life Ins. Co. v. Massachusetts*, 471 U.S. 724, 741 (1985). It also noted that Congress did not intend to preempt areas of traditional state regulation. *Id.* at 740.

145.  Defendant RSLI is based in Pennsylvania. Its bad-faith conduct violates that state's insurance law regarding unfair claim determination practices: "In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%. (2) Award punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer." 42 Pa. C.S. § 8371.

146.  Pennsylvania's law falls within ERISA's "savings clause" because it meets the Supreme Court's requirement that "in order to regulate insurance, a law must not just have an impact on the insurance industry, but be specifically directed toward that industry." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987).

147.  With respect to the issue of congressional intent, the Supreme Court's analysis starts with a presumption against pre-emption. Congress did not intend to pre-empt areas of traditional state regulation (such as insurance) absent evidence that it was the clear and manifest purpose of Congress. *California Division of Labor Standards Enforcement v. Dillingham*, 519 U.S. 316, 325 (1997).

148.  The Pennsylvania statute authorizing punitive damages against an insurance company acting in bad faith is based on the development of punitive damages in the United States as a means of punishing a defendant bad actor in cases where the civil award was deemed insufficient to punish the defendant.

149.  In this case, merely paying me the benefits it was legally obligated to pay me under the policy from March to September 2020 is not a sufficient action to punish Defendant RSLI's misbehavior.

150.  An extra level of punishment is appropriate in this case because restoring benefits I should have received in the first place does not suffice to punish RSLI for its malicious, wanton, intentional,

outrageous, and reckless decision to terminate my benefits effective March 2020 with no substantial evidence to overturn its two previous decisions that I'm Totally Disabled. Punitive damages thus must be awarded to me under the Pennsylvania statute to punish the wrongdoer for its bad conduct and deter such conduct by RSLI and other insurance companies toward other disabled beneficiaries in the future.

151. The unavailability of punitive damages under certain federal laws such as ERISA does not necessarily foreclose a plaintiff from seeking punitive damages through concurrent claims such as a state law regulating insurance that is not pre-empted.

152. The operative question is determining whether a state law is excepted from pre-emption under ERISA's savings clause is whether it regulates insurance. *UNUM Life Ins. Co. v. Ward*, 526 U.S. 358, 367-68 (1999). Clearly the Pennsylvania statute regulates insurance as it is strictly written to govern "an action arising under an insurance policy." The Court need not look beyond the plain meaning of the statute.

153. Insurance regulation occurs almost exclusively at the state level. Insurance companies are required to submit to state regulatory oversight in every jurisdiction in which they are licensed to operate.

154. "[T]o recover in a bad faith action, the plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364 (Pa. 2017).

155. Defendant RSLI, by reversing its two prior terminations of my long-term disability benefits September 16, 2020, admits it did not have a reasonable basis for denying benefits under the policy and it knew or recklessly disregarded its lack of a reasonable basis by failing to send me for an IME earlier than 30 days after the 90-day deadline to render a final appeal decision.

156.  RSLI in fact had pledged twice in 2019 and 2020 to send me for an IME, but never did so, knowing that no competent doctor examining me would issue a finding of anything other than "Totally Disabled." Pl. Ex. 24.

157.  The good-faith obligation of an insurer requires it go beyond the letter of the insurance policy and act fairly and reasonably in processing, investigating, evaluating, and paying a claim. The evidence shows Defendant RSLI did none of the above.

158.  "'Bad faith' on part of the insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e. good faith and fair dealing) through some motive of self-interest or ill will …" *Rancosky*, quoting from the 6th Edition of *Black's Law Dictionary*.

159.  "[W]e hold that proof of an insurer's motive of self-interest or ill-will, while potentially probative … is not a mandatory prerequisite to bad faith recovery under Section 8371." *Id.*

160.  In addition to the Pennsylvania statute, pre-judgment interest recovery is also available as equitable relief under ERISA, as discussed above. *See also Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 209-10 (3rd Cir. 2004) and *Cottrill v. Sparrow, Johnson, & Ursillo, Inc.*, 100 F.3d 200, 225 (1st Cir. 1996).

161.  The insurer's implied duty of good faith is just one instance of the covenant that exists "in every contract that neither party will do anything which will injure the right of the other to the receive the benefits of the agreement." In the insurance context, the duty requires that the "insurer, in deciding whether a claim should be compromised, must take into account the interest of the insured and give it at least as much consideration as it does to its own interest." *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 201 (Cal. 1958).

162.  In addition to the Pennsylvania law that is not pre-empted by ERISA, ERISA itself provides that compensatory damages may be awarded under certain circumstances.

163.  "Justice Brennan stated that section 502(a)(3) provides for an award of 'appropriate equitable relief' for acts or practices that violate any provision of ERISA or the terms of a retirement plan. *Id*. at 153, 105 S.Ct. at 3096. Therefore, a beneficiary may obtain 'appropriate equitable relief' whenever an administrator breaches the fiduciary duties set forth in section 404(a). *Id*. at 154, 105 S.Ct. at 3096." *Warren v. Soc'y Nat'l Bank*, 905 F.2d 975 (6th Cir. 1990).

164.  "Finding that 'Congress intended by Sec. 404(a) to incorporate the fiduciary standards of trust law into ERISA,' he would apply in ERISA cases 'black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits.' *Id*. at 152-53, 105 S.Ct. at 3095-96 (footnote omitted). Under the law of trusts, 'a beneficiary [is] entitled to a remedy 'which will put him in the position in which he would have been if the trustee had not committed the breach of trust.' ' *Id*. at 157 n. 16, 105 S. Ct. at 3098 n. 16 (quoting *Restatement (Second) of Trusts* Sec. 205, and Comment a (1959)). Therefore, construing sections 404(a) and 502(a)(3) together, a beneficiary may obtain 'appropriate equitable relief' for breach of fiduciary duties, and such equitable remedies 'include provision of monetary damages.' *Id*. at 154 n. 10, 105 S. Ct. at 3096 n. 10." *Id*.

165.  By acting negligently and in its own interest, Defendant RSLI violated its contractual duty to pay my benefits on time. It therefore violated the "prudent man" standard of care under ERISA § 404(a). That exposes RSLI to additional damages beyond simply having to pay benefits that it should have paid to start with. *Id*.

166.  The injuries I have suffered – including paying extra interest on credit-card debts, having to defer purchase of a home although I qualified for two District of Columbia assistance programs for the poor and disabled, pain and suffering, mental anguish, *et. al.* – are direct injuries resulting from

Defendant RSLI's bad-faith breach of contract. Therefore, my claims are contractual and not extracontractual.

167. "The question before this court is whether section 502(a)(3) – part of a 'carefully integrated' enforcement scheme – permits the recovery of compensatory damages to redress a direct injury to a participant by a fiduciary that allegedly violated its contractual duty under the terms of the retirement plans and under the provisions of ERISA. … Given that Congress intended to incorporate the fiduciary standards of trust law into ERISA, it is proper to apply 'black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits.' Under the law of trusts, 'a beneficiary is entitled to a remedy 'which will put him in the position in which he would have been if the trustee had not committed the breach of trust.' ' '[O]ther appropriate equitable relief' under section 502(a)(3), for breach of fiduciary duties set forth in section 404(a), includes the provision of monetary damages." *Id*.

168. "[U]nder the law of trusts, a beneficiary is entitled to a remedy that will put him in the position he would have been in if the fiduciary had not committed a breach of trust, and that such a remedy includes monetary damages. … Our position is supported by decisions of other courts of appeals finding that equitable relief includes monetary damages where required to afford complete relief. It is the historic purpose of equity to secure complete justice, and courts may adjust their remedies so as to grant the necessary relief." *Id.*

169. Policyholders in the District of Columbia may sue their insurers for a breach of the implied contractual covenant of good faith and fair dealing, despite the fact that D.C. does not recognize the tort of bad faith refusal to pay insurance benefits. *Nugent v. UNUM Life Ins. Co. of Am.*, 752 F. Supp. 2d 46 (D.D.C. 2010).

170. In *Nugent*, this Court first held that a claim for breach of the implied contractual covenant of good faith and fair dealing is entirely separate from a bad-faith claim based in tort. Under D.C.

law, all contracting parties are charged with an implied duty of good faith and fair dealing, and that duty is breached when one of the parties "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id*. This Court found that the plaintiff's allegations – that the insurer acted or failed to act in a way that injured or destroyed her rights under the insurance contract – properly stated a claim for beach of the implied covenant of good faith and fair dealing.

171. "An insurance policy establishes a contractual relationship between the company and its policy holder. Under District of Columbia law, every contract contains within it an implied covenant of both parties to act in good faith and damages may be recovered for its breach as part of a contract action. … Disputes relating to the respective obligations of the parties to an insurance contract should generally be addressed within the principles of law relating to contracts, and bad faith conduct can be compensated within those principles." *Choharis v. State Farm Fire & Casualty Co.*, No. 06-CV-234 (D.C. 2008).

172. "Under D.C. law, the elements required to prevail on a breach of contract are '(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.'" *Camarda v. Certified Financial Planner Board of Standards, Inc.,* No. 15-7080 (D.C. Cir. 2016), quoting from *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

173. "Under D.C. law, 'all contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.*, quoting from *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (internal quotation marks omitted).

174. "In light of the plain language of the statute, the common law of trusts, and the role of courts in equity, we find that the damages sought … are recoverable as 'other appropriate equitable relief' under section 502(a)(3)(B)(i)." *Warren v. Society National Bank*, 905 F.2d 975 (9th Cir. 1990).

175. **BAD FAITH BY DR. BRODNER:** I incorporate all arguments concerning Dr. Brodner's bad faith from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

176. **BAD FAITH BY DR. JIVA:** I incorporate all arguments concerning Dr. Jiva's bad faith from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

177. **ALL DEFENDANTS ARE GUILTY OF BAD FAITH:** All three defendants acted in bad faith by dishonestly reviewing my medical records and previous determinations by my physicians, independent medical examiners, and the Social Security Administration that I remain Totally Disabled.

178. All three defendants knowingly misrepresented my medical conditions to reach a conclusion that my benefits should be terminated. The facts actually show my conditions have ***worsened*** since the last IME took place in 2017, after which Defendant RSLI continued my benefits until a sudden termination effective March of this year. Pl. Exs. 12 & 13.

179. Dr. Sambandam confirmed that my sleep disorders have worsened, proving my allegations of bad faith against all three defendants: "On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

180. All defendants breached their obligations to deal with my continued disability claim in good faith and with fair dealing.

181. All defendants failed to thoroughly investigate the worsening of my sleep disorders since the last IME was conducted in 2017. The sleep logs I submitted substantiate that my sleep time, average circadian rhythm, hypersomnolence, and other measurements grew worse. Pl. Exs. 12 & 13. Good faith would have only led to a conclusion that because my sleep disorders worsened, I

remained Totally Disabled as defined by the policy and am not capable of returning to consistent full-time employment.

182.  RSLI's "termination and appeal rejection letters, which were based greatly on two deeply flawed 'peer reviews' [by Drs. Brodner and Jiva] (without ever sending Lucas to a circadian rhythm sleep disorder specialist for independent exam as would have been appropriate procedure), fail to comprehend that Non-24 and hypersomnolence significantly affect our ability to carry out most routine activities – including work. Being able to go to sleep and wake up around the same time every day is the most basic and fundamental of all routine human activities. In fact, it is the foundation upon which any and all other routines can be built. Having Non-24 plus hypersomnolence mean this foundational aspect of life, which is wholly taken for granted as automatic by nearly everyone, is wholly unattainable for both Lucas and me. We can't have routine activities because our brains are incapable of routine altogether." Pl. Ex. 21.

183.  "Bad faith requires more than mere negligence; examples include lack of diligence, purposeful failure to perform, and interference with the other party's ability to perform." *Camarda*, quoting from *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013). "Fair dealing means reasonable conduct that is not arbitrary and capricious." *Id.*

184.  **ERISA REQUIRES DEALING IN GOOD FAITH:** Defendant RSLI should not have arbitrarily refused to credit my reliable evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003).

185.  Defendant RSLI acted in bad faith by unreasonably terminating my benefits with only a one-month notice. It should have continued to pay my benefits pending appeal since it had no evidence to support its conclusion that my medical conditions had improved enough to where I was capable of returning to full-time work on a consistent basis.

**Count III: Intentional Infliction of Emotional Distress as Against All Defendants**

186.  As part of reviewing bad faith by an insurance company under ERISA and 42 Pa. C.S. § 8371, the Court shall consider other torts that, taken as whole, show a pattern of conduct toward the insured that is not acting in good faith and with fair dealing.

187.  Although 42 Pa. C.S. § 8371 only applies to insurance companies, general common-law torts apply as to the misconduct by Defendants Drs. Brodner and Jiva.

188.  A tort is defined as a private wrong or injury done to person or property for which a legal remedy is afforded. A tort arises where there is: 1) a duty of due care; 2) a breach of that duty; 3) a legally protected injury; and 4) a causal relationship between that injury and the action such that the action "proximately caused" the injury.

189.  For civil tort cases, the standard of proof is preponderance of the evidence. Preponderance of the evidence means that it is more likely than not that the defendant is legally responsible for the plaintiff's injuries.

190.  Intentional infliction of emotional distress occurs when a defendant acts and the conduct: 1) is outrageous; 2) is taken for the purpose of causing the victim emotional distress so severe that it could be expected to adversely affect mental health; and 3) causes such distress.

191.  Mental suffering is an emotional response to an experience that arises from the effect or memory of a particular event, occurrence, pattern of events, or condition. Emotional distress can usually be discerned from its symptoms (i.e. anxiety, depression, suicidal ideation or attempt, loss of ability to perform tasks, or physical illness).

192.  "The tort of IIED has three elements: '(1) extreme and outrageous conduct … that (2) intentionally or recklessly (3) caused [the plaintiff] severe emotional distress.'" *Tolson v. The Hartford Financial Services Group, Inc.,* No. 16-440 (D.D.C. 2016), quoting from *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1037 (D.C. 2015).

193.  The D.C. Court of Appeals has held that a plaintiff may recover for emotional distress where the defendants have breached a duty to avoid inflicting such distress based upon a professional obligation to care for plaintiff's well-being or due to some type of relationship between defendant and plaintiff that necessarily implicates plaintiff's well-being. *Hedgepath v. Whitman Walker Clinic.*, No. 07-CV-158 (D.C. 2011).

194.  In this case, all three defendants had a professional obligation to care for my well-being because I am disabled. I received long-term disability benefits from Defendant RSLI and the Social Security Administration for nearly eight years to compensate for that disability before they were improperly terminated.

195.  Defendants Drs. Brodner and Jiva also had a relationship with me that implicates my well-being because they were tasked with professionally evaluating my medical records and determining whether there was any cause to terminate my disability benefits.

196.  Despite there being no such evidence, Defendants Drs. Brodner and Jiva breached their duty to avoid inflicting emotional distress on me by writing reports full of falsehoods concluding I am no longer disabled, without any evidence to support their findings. Pl. Exs. 7 & 9. *See also* my discussion of their falsehoods and unsupported conclusions at Pl. Exs. 8 & 10. *See also* my complaints filed against them with the medical licensing authorities in Florida and New York at Pl. Exs. 21 & 22.

197.  The "peer reviews" issued by Defendants Drs. Brodner and Jiva (without ever meeting with me or even speaking with me on the phone) were completely contradicted by the IME report written by Dr. Sambandam: "Mr. Wall cannot work in a full-time capacity from 11/10/2019 onward. On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be ab le to function in a work capacity in the future." Pl. Ex. 18.

198. All defendants are aware, through reviews of my medical records, that I have a long history of mental illness including Bipolar II Disorder and Generalized Anxiety Disorder. They are aware I was hospitalized after a suicide attempt in August 2016 and have suffered numerous other episodes of major depression and suicidal ideation.

199. I incorporate all arguments concerning Defendant RSLI's intentional infliction of emotional distress from my April 30, 2020, appeal letter into this Second Amended Complaint. Pl. Ex. 8.

200. I incorporate all arguments concerning Defendant Dr. Brodner's intentional infliction of emotional distress from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

201. I incorporate all arguments concerning Defendant Dr. Jiva's intentional infliction of emotional distress from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

202. Emotional distress I have suffered as a result of all defendants' actions include an episode of suicidal depression from August 18-22, 2020.

203. "Recently, the termination of Lucas' long-term disability benefits that RSLI paid him from mid-2012 to February 2020 have thrust him back into despair. He's already lost almost everything in his life, and now he's been blindsided with even more loss from the little he has left. Lucas has been crushed this year by an inability to pay off credit-card debt because of the many thousands of dollars [RSLI] withheld from him [due to Dr. Brodner and Jiva's reports] as well as an inability to move ahead with purchasing a condominium in Washington because, although he's qualified for two District of Columbia first-time-homebuyer programs for the poor and disabled, [the] decision to terminate his benefits has made him unable to qualify for a mortgage under such programs (there is a minimum income required to purchase)." Pl. Ex. 23.

204. "This despair is wholly warranted, as he has literally no medical recourse left to pursue – a statement I make based upon the explicit advice given to me from two highly specialized and renowned doctors I've had the privilege to see since I moved to Germany with my wife five years ago. Only a few weeks ago, this despair drove Lucas into another suicidal crisis so worrisome that my wife and I are presently making arrangements for him to come stay with us in Germany for awhile so we can look after him." *Id.*

205. All defendants were aware that suddenly terminating long-term disability benefits I had received for eight years, cutting off half my income with only a one-month notice, would likely cause me to suffer extreme emotional distress.

206. All defendants engaged in extreme and outrageous conduct that intentionally or recklessly caused me to suffer extreme emotional distress. *See Cooke-Seals vs. District of Columbia,* 973 F. Supp. 184, 188 (D.D.C. 1997).

207. Courts have held that an action that violates public policy might qualify as intentional inflection of emotional distress. *See Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C. 1984).

208. The public policy of the United States and the District of Columbia is to protect the rights of people with disabilities. *See* Americans with Disabilities Act and D.C. Human Rights Act, *et. al.*

209. The public policy of the United States is to ensure independent and impartial decisionmaking on ERISA claims.

210. Defendant RSLI violated federal regulations concerning independent and impartial decisionmaking: "In the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not

be made based upon the likelihood that the individual will support the denial of benefits." 29 CFR § 2560.503-1(b)(7).

211. All three defendants are held to higher standards of behavior when they are dealing with individuals "who it is reasonable to assume are particularly susceptible to emotional distress." *Drejza v. Vaccaro*, 650 A.2d 1308, 1313 (D.C. 1994).

212. In such a situation, "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." *Id.*, quoting *Restatement (Second) of Torts*, § 46, comment (f).

213. Several cases recognize that a defendant's breach of contract may give rise to allegations of intentional, tortious infliction of emotional distress. *See*, e.g., *Asunscion v. Columbia Hosp. for Women,* 514 A.2d 1187, 1990 n. 3 (D.C. 1986); *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37-38 (D.C. 1982); and *Washington v. Government Employees Ins. Co.*, 769 F. Supp. 383, 388 n. 8 (D.D.C. 1991). These cases provide that a tort action could proceed when a breach of contract "merge[d] with, and assume[d] the character of the tort of intentional infliction of severe emotional distress." *Sere* at 37.

**Count IV: Negligence as Against All Defendants**

214. Negligence is a legal standard that means the party responsible for an injury failed to behave as a reasonably prudent person would under the same circumstances.

215. Negligence is the term used by tort law to characterize behavior that creates unreasonable risks of harm to persons and property. A person acts negligently when his behavior departs from the conduct ordinarily expected of a reasonably prudent person under the circumstances.

216.  To show  negligence, a plaintiff must prove: A) The defendant owed the plaintiff a reasonable

duty of care, an obligation to the plaintiff recognized by law and/or contract; B) The defendant

breached its duty of care. A breach refers to a failure to uphold the duty of care by some act or

omission. That failure is typically the result of negligence, but it could also be because of

recklessness or intentional wrongdoing; C) The breach caused injury to the plaintiff; and D)

Because of the breach and injury, the plaintiff suffered damages.

217.  ERISA does not pre-empt state-law negligence claims. *Padeh v. Zagoria*, 900 F. Supp. 442, 488

(S.D. Fla. 1995).

218.  "[I]t is evident that while ERISA's preemption clause is rather broad, it is not all-encompassing.

As noted by the decisions above, courts have consistently determined that some state laws do

not 'relate to' an ERISA plan." *Id*.

219.  "Whether a particular state law 'relates to' an ERISA plan is by no means a simple issue to

resolve. 'Relates to' has potentially broad ramifications and courts must be careful not to exclude

legitimate causes of action simply because an ERISA plan is somehow tied into the facts of a

particular case. Thus, it is paramount that courts look to the Congressional intent behind the

preemption clause." *Id.*

220.  Negligence should be considered in parallel with bad faith, which is covered by the Pennsylvania

statute regulating insurance. 42 Pa. C.S. § 8371.

221.  Negligence is also a stand-alone tort demonstrating a failure to behave with the level of care

that someone of ordinary prudence would have exercised under the same circumstances.

222.  Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care

are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable

severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the

risk of harm.

223. "In the District of Columbia, 'a claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach.'" *Tolson v. The Hartford Financial Services Group, Inc.,* No. 16-440 (D.D.C. 2017), quoting from *Poola v. Howard Univ*., 147 A.3d 267, 289 (D.C. 2016) (alternation and citation omitted).

224. Typical recoverable damages in a negligence claim are enumerated in D.C. Civil Jury Instruction No. 13-1. They include (as relevant to this case): Any emotional distress that the plaintiff has suffered, any emotional distress that the plaintiff might suffer in the future, any inconvenience the plaintiff has experienced, and any inconvenience the plaintiff might experience in the future.

225. **NEGLIGENCE BY RSLI:** Defendant RSLI owed a reasonable duty of care to ensure it continued my long-term disability benefits as provided by the policy since I remain Totally Disabled.

226. By terminating my benefits in January 2020 in violation of the insurance policy and then denying my appeal July 29, 2020, Defendant RSLI breached its duty of care.

227. Defendant RSLI's negligence in improperly terminating my benefits was the direct and proximate result of my injuries and damages, i.e. loss of pre-tax income in the amount of $2,127.71 per month for March to August 2020, accumulation of credit-card interest I could not pay as a result of the loss of benefits due, and depriving me of the ability to move forward with purchasing a home this year utilizing two District of Columbia assistance programs for the poor and disabled.

228. **NEGLIGENCE BY DRS. BRODNER & JIVA:** Defendants Drs. Brodner and Jiva owed a reasonable duty of care to ensure they performed factually accurate, independent "peer reviews" of my medical records under contract to Defendant RSLI. A doctor owes a duty of care to treat any patient according to the standards of the medical profession, even one assigned to it for evaluation by an insurance company or other medical provider.

229. I incorporate all arguments concerning Dr. Brodner's negligence from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

230. I incorporate all arguments concerning Dr. Jiva's negligence from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

231. Defendants Drs. Brodner and Jiva "in no way explained how [their] conclusions are rationally related to the medical evidence. … It is difficult to credit a decision as 'reliable' when the reviewer fails to link his conclusions to the patient's medical history." *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir 2017).

**Count V: Harassment as Against Defendant RSLI**

232. Harassment is generally defined as a course of conduct which annoys, threatens, intimidates, alarms, or puts a person in fear. Harassment is unwanted, unwelcomed and uninvited behavior that demeans, threatens, or offends the victim and results in a hostile environment for the victim.

233. I incorporate into this Second Amended Complaint the arguments of harassment against Defendant RSLI as detailed in my April 30, 2020, appeal letter. Pl. Ex. 8.

**Count VI: Invasion of Privacy as Against Defendant RSLI**

234. Invasion of privacy is the intrusion into the personal life of another, without just cause, which can give the person whose privacy has been invaded a right to bring a lawsuit for damages against the person or entity that intruded. It encompasses workplace monitoring, Internet privacy, data collection, and other means of disseminating private information.

235. I incorporate into this Second Amended Complaint the arguments of invasion of privacy against Defendant RSLI as detailed in my April 30, 2020, appeal letter. Pl. Ex. 8.

236. An insurance agency, even in connection with an ERISA plan, can be held liable for tortious invasion of privacy in connection with actions of investigators tasked with uncovering information regarding a claimant. *Dishman v. UNUM Life Ins. Co. of Am.,* 269 F.3d 974 (9th Cir. 2001).

237. "California's common law tort remedy for an 'unreasonably intrusive' investigation that amounts to an invasion of privacy bears scant resemblance to the laws the Supreme Court has found violative of [ERISA's pre-emption clause]. By no stretch of the imagination can it be said to 'mandate employee benefit structures or their administration.' … Making ERISA administrators liable for investigations perpetrated by their agents 'which would be objectionable or offensive to the reasonable man' simply cannot be said to interfere with nationally uniform plan administration …" *Id.* at 982.

238. This tort claim does not depend on or derive from my claim for benefits in any meaningful way.

239. Pre-emption "does not occur … if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability. The fact that the conduct at issue allegedly occurred 'in the course of UNUM's administration of the plan' does not create a relationship sufficient to warrant preemption. If that were the case, a plan administrator could 'investigate' a claim in all manner of tortious ways with impunity.'" *Id.* at 984.

240. "Though there is clearly some relationship between the conduct alleged and the administration of the plan, it is not enough of a relationship to warrant preemption. We are certain that the objective of Congress in crafting Section 1144(a) was not to provide ERISA administrators with blanket immunity from garden variety torts which only peripherally impact daily plan administration." *Id.*

**Count VII: Medical Malpractice as Against Defendants Drs. Brodner & Jiva**

241. Due to the immense trust we are forced to place in healthcare professionals, medical malpractice is perhaps the most disturbing form of personal-injury claim. Medical malpractice

occurs when a patient is harmed by a doctor (or other medical professional) who fails to competently perform his or her medical duties.

242. I incorporate all arguments concerning Dr. Brodner's medical malpractice (aka gross incompetence) from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

243. I incorporate all arguments concerning Dr. Jiva's medical malpractice (aka gross incompetence) from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

244. "These doctors [Brodner and Jiva] are not specialists in circadian rhythm sleep disorders, and their ignorance of CRSD's is glaringly apparent. They committed what is called 'gaslighting' – when doctors fail to make a good-faith effort to understand a patient's 'invisible diseases.' Attachment 42. This is considered medical malpractice." Pl. Ex. 23.

245. An injured patient must prove the following four elements to be successful in a medical malpractice claim: 1) The doctor owed the patient a duty of care; 2) The doctor breached the duty to provide adequate care owed to the patient; 3) The doctor's action caused or contributed to the patient's injury; and 4) The patient suffered an injury that resulted in damages.

246. Defendant Dr. Brodner claims to be a sleep specialist, but a check of online records indicate he is NOT certified as such by the American Board of Sleep Medicine. Ex. 15. This raises the question of whether Dr. Brodner is practicing medicine fraudulently by misrepresenting his qualifications.

247. Negligence is at the center of all medical malpractice cases. I incorporate into this count all arguments related to negligence asserted against Defendants Drs. Broder and Jiva above under Count IV.

248. A doctor's negligence must have caused an injury, i.e. denial of continued long-term disability benefits by an insurance carrier and severe emotional distress. The patient must show that it is "more likely than not" that the doctor's incompetence directly caused the injury.

249. The injury must have led to specific damages, i.e. loss of continued long-term disability benefits, interest payments on credit-card debt, inability to move forward with a home purchase, emotional distress, pain and suffering, mental anguish, etc.

250. Failure to diagnose appropriate medical conditions that cause disability: If a competent doctor would have discovered the patient's illness or made a different diagnosis, directly or to an insurance carrier, which in turn would have led to a better outcome than the one actually achieved, then the patient has a viable medical malpractice claim.

251. To hold a doctor liable for medical malpractice, a person must have some form of a doctor/patient relationship. A person likely has a doctor/patient relationship with a variety of providers that treat him, even if they are not his primary-care physician. This includes any doctors that evaluate one's medical records for an insurance company to decide if he is entitled to healthcare, disability, and other benefits.

252. "In medical-malpractice cases, a physician-patient relationship is a prerequisite to the existence of any duty. *St. John v. Pope,* 901 S.W.2d 420, 423 (Tex. 1995) … To establish such a relationship, the physician need not have direct physical contact with the patient. *St. John*, 901 S.W.2d at 424. Indeed, a physician-patient relationship may be established at the express or implied consent of the physician. *Id.* at 423." *Ortiz v. Glusman*, 334 S.W.3d 812, 817 (Tex. App. 2011).

253. In this case, Defendants Drs. Brodner and Jiva expressed consent to a physician/patient relationship with me when they agreed to receive thousands of dollars of compensation from Defendant RSLI to evaluate my medical records and recommend whether or not I remain Totally Disabled.

254.  There must be a link between the doctor's negligent behavior and the patient's injury. In this case, the negligence of Defendants Drs. Brodner and Jiva led to Defendant RSLI terminating my disability benefits, which has caused numerous injuries to me as cited above.

255.  Dr. Brodner practices in Florida. "The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102.

256.  Dr. Jiva practices in New York. In that state, "To establish a *prima facie* case of liability in a medical malpractice action, a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury (*see Gibson v. D'Amico*, 97 A.D.2d 905; see also *Gross v. Friedman*, 138 A.D.2d 571, affirmed 73 N.Y.2d 721; *Kelly v. Lieber*, 261 A.D.2d 441)." *Berger v. Becker*, 272 A.D.2d 565 (N.Y. App. Div. 2000).

257.  In general, medical malpractice claims in New York are governed principally by the 1985 Medical Malpractice Reform Act.  The Act is comprised of numerous procedural and substantive revisions and additions to several of the state's Consolidated Laws, including the Public Health Law, Civil Practice Law & Rules, Education Law, Insurance Law, and Judiciary Law. The specific statutory provisions of the Act are thus scattered throughout the foregoing Consolidated Laws.

258.  There are four basic elements of a compensable medical malpractice claim in New York: 1) The defendant is a healthcare provider who owed the injured patient a legal duty of care; 2) The healthcare provider's actions deviated from or fell below the accepted standards of medical practice thereby breaching the legal duty of care owed; 3) The healthcare provider's breach of the required standards of medical practice proximately caused or contributed to causing injury to the

patient; and 4) The injured patient suffered damages because of the injuries. *See Gross v. Friedman*, 73 N.Y.2d 721 (N.Y. 1988) and *Stukas v. Streiter*, 83 A.D.3d 18, 23 (N.Y. App. Div. 2011).

259.  Defendant Dr. Jiva's professional misconduct by a physician matches several definitions contained in New York Education Law § 6530 including: (4) Practicing the profession with gross negligence; (6) Practicing the profession with gross incompetence; (21) Willfully making or filing a false report; and (24) Practicing or offering to practice beyond the scope permitted by law, or accepting and performing professional responsibilities which the licensee knows or has reason to know that he or she is not competent to perform.

## V. PRAYER FOR RELIEF

WHEREFORE, I request this Court grant the following relief:

A.  Award interest on the amount of my RSLI benefits from March to August 2020 that were not paid until September 2020 in the amount equal to the prime rate of interest (currently 3.25%) plus 3% (for a current total of 6.25%) pursuant to 42 Pa. C.S. § 8371. This amount is $215.91. Pl. Ex. 19. In the alternative, award interest in the amount of 6% pursuant to D.C. Code § 28–3302(a). (Counts I & II)

B.  Assess all costs and attorney's fees (if I later hire an attorney during this litigation) against Defendant RSLI pursuant to ERISA and 42 Pa. C.S. § 8371. If I elect to continue proceeding *pro se*, RSLI should pay fees to me in lieu of an attorney for the time I have spent litigating this matter. (Counts I & II)

C.  Order Defendant RSLI to pay my long-term disability benefits until I reach the retirement age of 67, as required by the policy, pursuant to ERISA, barring discovery of any substantial evidence that: 1) I have returned to work on a consistent full-time basis; or 2) a scientific advancement concerning the treatment of Non-24-Hour Sleep/Wake Disorder and/or Hypersomnolence

Disorder has led to achievement of a cure for my sleep disorders, as certified by a physician specializing in Circadian Rhythm Sleep Disorders who has treated me successfully based on the new scientific advancement. (Count I)

D.  Enjoin Defendant RSLI from conducting any further examinations of my claim for long-term disability benefits, except to determine whether any of the two exceptions listed in ¶ C above exist, since my conditions are medically recognized as chronic, life-long, and untreatable – facts accepted by RSLI after the three IME's performed in 2016, 2017, and 2020. (Count I)

E.  Enjoin Defendant RSLI, as part of any probe of a cure described in ¶ C(2) above, from utilizing a service known as "peer review" whereby a physician looks at my medical records and issues a report without ever meeting with me or even speaking with me on the phone. (Count I)

F.  Enjoin Defendant RSLI from sending me to any physician for an "independent medical exam" or similar procedure unless it has first obtained and shared with me substantial evidence that shows the likelihood of one or both exemptions listed in ¶ C above. (Count I)

G.  Award me compensatory damages from all three defendants for the interest I've had to pay on credit-card accounts from March to September 2020 as a direct result of the improper termination of my long-term disability benefits.  (Counts II-VII)

H.  Also award me compensatory damages from all three defendants in an amount equal to treble one year's long-term disability benefits ($25,532.52 X 3 = $76,597.56 for each defendant, for a total of $229,792.68) for the financial and emotional distress, mental anguish, pain and suffering, inconvenience, as well as loss of enjoyment of life that I have suffered because of their actions in bad faith, intentional infliction of emotional distress, negligence, harassment, invasion of privacy, and medical malpractice – including my inability to move forward with purchasing a home this year using two District of Columbia assistance programs for the poor and disabled. (Counts II-VII)

I.   Award me punitive damages as authorized by 42 Pa. C.S. § 8371 and other laws against all three defendants. Specifically, I demand: Treble damages ($76,597.56) against Defendant RSLI for Counts II-VI, treble damages ($76,597.56) against Defendant Dr. Brodner for Counts II, III, IV, and VII, and treble damages ($76,597.56) against Defendant Dr. Jiva for Counts II, III, IV, and VII, for a total of $229,792.68.

J.   Grant other declaratory and injunctive relief as may be necessary to ensure that Defendant RSLI acts in good faith in continuing to pay my long-term disability benefits until I turn 67 or return to consistent full-time employment, pursuant to the policy terms and enforceable under ERISA.

K.   Grant such other and further relief as the Court may deem just and proper under the circumstances.

I demand a jury trial on any issue triable of right by a jury pursuant to Fed. R. Civ. P. 38. Although jury trials are not typically permitted for ERISA claims, this is a hybrid claim brought under ERISA and other laws. Hybrid claims joined with an ERISA action may be tried before a jury. *Stewart v. KHD Deutz of Am. Corp.*, 75 F.3d 1522, 1528 (11th Cir. 1996).

Respectfully submitted this 24th day of September 2020.

*Lucas Wall*

Lucas Wall, plaintiff
435 10th St., NE
Washington, DC 20002
Telephone: 202-351-1735
E-Mail: Lucas.Wall@yahoo.com

# Plaintiff's Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **LUCAS WALL** | : | |
| 435 10th St., NE | : | |
| Washington, DC 20002 | : | |
| 202-351-1735 | : | |
| | : | |
|   Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:20-cv-2075-EGS |
| | : | |
| **RELIANCE STANDARD LIFE INSURANCE CO.** | : | Judge Emmet Sullivan |
| Suite 1500 | : | |
| 2001 Market St. | : | **JURY TRIAL DEMANDED** |
| Philadelphia, PA 19103 | : | |
| 267-765-4182; | : | |
| | : | |
| **DAVID BRODNER, M.D.** | : | |
| Suite 208 | : | |
| 8794 W. Boynton Beach Blvd. | : | |
| Boynton Beach, FL 33472 | : | |
| 561-735-8750; and | : | |
| | : | |
| **TAJUDDIN JIVA, M.D.** | : | |
| 2567 Sheridan Dr. | : | |
| Tonawanda, NY 14150 | : | |
| 716-836-1388, | : | |
| | : | |
|   Defendants. | : | |

## SECOND AMENDED COMPLAINT

### I. PARTIES

    Plaintiff Lucas Wall resides at 435 10th St., NE, Washington, DC 20002. My phone number is 202-351-1735.

    Defendant Reliance Standard Life Insurance Co. ("RSLI") is a corporation headquartered at Suite 1500, 2001 Market St., Philadelphia, PA 19103. Its phone number is 267-765-4182. RSLI is an insurance company engaged in interstate commerce. It does business in the District of the Columbia. The group long-term

1

disability insurance policy at issue in this litigation was issued by Defendant RSLI to a D.C.-based nonprofit organization.

Defendant David Brodner is a medical doctor with a principal place of business at Center for Sinus, Allergy, & Sleep Wellness, Suite 208, 8794 W. Boynton Beach Blvd., Boynton Beach, FL 33472. His office phone number is 561-735-8750.

Defendant Tajuddin Jiva is a medical doctor with a principal place of business at Phoenix Rising Sleep Medicine, 2567 Sheridan Dr., Tonawanda, NY 14150. His office phone number is 716-836-1388.

## II. BASIS FOR JURISDICTION & VENUE

This case was originally filed in the District of Columbia Superior Court but was removed by Defendant RSLI to this Court because RSLI asserts it involves a federal question under 28 USC § 1331.

——Jurisdiction of this Court is based upon the Employee Retirement Income Security Act ("ERISA") (29 USC § 1001 *et. seq.*). These provisionsERISA grants the district court jurisdiction to hear civil actions brought to recover interest on delayed benefit payments, obtain costs and fees, and enjoin any act or practice that violates any provision of law or the terms of a plan. A participant may also seek other appropriate equitable relief to redress such violations and/or to enforce the terms of the plan. 29 U.S.C. § 1132(a)(3).

recover benefits due to a beneficiary under the terms of an employee welfare benefit plan. In this case, that the plan is a long-term disability insurance policy underwritten and administered by Defendant RSLI for the employees of the American Association of State Highway & Transportation Officials ("AASHTO"), a nonprofit organization based in the District of Columbia.

Jurisdiction of this Court is also based upon diversity of citizenship under 28 USC § 1332 because the amount at stake is more than $75,000 and none of the parties reside or do business in the same state.

Plaintiff Lucas Wall is a resident of the District of Columbia. Defendant ~~Reliance Standard Life Insurance Co.~~ RSLI has its principal place of business in Pennsylvania. Defendant Dr. David Brodner has his principal place of business in Florida. Defendant Dr. Tajuddin Jiva has his principal place of business in New York.

Venue is proper in this Court as the long-term disability insurance policy at issue was contracted to an employer in the District of Columbia, I reside in the District of Columbia, and I filed my original Statement of Claim in the D.C. Superior Court before this matter was removed by Defendant RSLI to this Court.

(NOTE: Per the Standing Order Governing Civil Cases Before Judge Emmet G. Sullivan (Dkt. 12 at ¶ 7), I have attached a marked copy of all changes to the first Amended Complaint by showing additions in green and deletions in red strikethrough. Pl. Ex. B.)

### III. STATEMENT OF FACTS

1. I was employed by AASHTO in Washington, DC, from June 2008 to March 2012, when I became Totally Disabled due to Non-24-Hour Sleep/Wake Disorder, Hypersomnolence Disorder, and Insomnia Disorder.

2. During my employment with AASHTO, I was covered under a group long-term disability insurance policy issued by Defendant RSLI. Pl. Ex. 1.

3. The policy constitutes an "employee welfare benefit plan" or "welfare plan" as those terms are defined in ERISA, 29 USC § 1002, and are subject to various provisions of that Act, including the enforcement provisions contained in Part 5.

4. I was declared legally disabled due to sleep disorders by a Social Security Administration judge in a ruling issued December 16, 2014, retroactive to March 21, 2012 – the last day I worked for AASHTO. Pl. Ex. 2.

5. I continue receiving Social Security Disability Insurance benefits.

6. ~~5.~~ I have not worked in any capacity since March 21, 2012.

6.7. Defendant RSLI approved my claim for long-term disability benefits under the policy April 18, 2016. Pl. Ex. 3.

7.8. Defendant RSLI based its approval on an independent medical exam ("IME") performed March 2, 2016, by Dr. Boisey Barnes. Pl. Ex. 4.

8.9. Just barely more than a year after approving my claim, Defendant RSLI sent me for another independent medical examIME August 25, 2017, by Dr. Karen Singleton, despite there being no evidence my sleep disorders had improved.

9.10. Dr. Singleton concluded I remained Totally Disabled. Pl. Ex. 5. Defendant RSLI continued my benefits as a result of her evaluation.

10.11. Defendant RSLI notified me January 29, 2020, that it was terminating my benefits. Pl. Ex. 6.

11.12. Defendant RSLI never sent me for an independent medical examIME as part of its 2019-20 review of my benefits, despite pledging it would do so. Pl. Ex. 24.

12.13. Defendant RSLI's termination of my benefits was based in great part on a November 10, 2019, "peer review" of my medical records by Defendant Dr. David Brodner. Pl. Ex. 7. Defendant Dr. Brodner never met with me in person or even spoke with me on the phone.

14. Defendant Dr. Brodner claims to be a sleep specialist, but a check of online records indicate he is NOT certified by the American Board of Sleep Medicine. Pl. Ex. 15.

13.15. I filed an appeal with Defendant RSLI on April 30, 2020, in which I argued for 33 pages that the termination of my benefits was improper and that Defendant Dr. Brodner's report was full of errors and false conclusions unsupported by the record. Pl. Ex. 8. I incorporate all facts stated in my April 30 appeal letter into this Second Amended Complaint.

14.16. During my appeal, Defendant RSLI never sent me for an independent medical examIME despite pledging it would do so.

4

15.17.  ~~As part of my appeal,~~ Instead, Defendant RSLI commissioned another "peer review" by Defendant Dr. Tajuddin Jiva, which he issued June 8, 2020. Pl. Ex. 9. ~~Defendant~~ Dr. Jiva never met with me in person or even spoke with me on the phone.

16.18.  I submitted to Defendant RSLI on July 26, 2020, a rebuttal to the report by Defendant Dr. Jiva that was full of errors and false conclusions unsupported by the record. Pl. Ex. 10. I incorporate all facts stated in my July 26 rebuttal letter into this Second Amended Complaint.

17.19.  At no time in all my medical records on file with Defendant RSLI is there a period where any medical provider deemed that my condition has improved. In fact, the records reveal a continuous course of disability, with sleep logs and data graphs showing only a **worsening** of my sleep disorders since the last IME in August 2017. Pl. Exs. 12 & 13.

18.20.  Defendant RSLI denied my appeal July 29, 2020 – on the 90-day deadline to make a final determination under the policy terms and federal regulations. Pl. Ex. 11.

19.21.  Since Defendant RSLI never sent me for an ~~independent medical exam~~IME as it had pledged in both 2019 and 2020, I sent a letter July 31, 2020, demanding my appeal be reconsidered and that the promised IME take place. Pl. Ex. 24.

20.22.  Defendant RSLI agreed to reconsider its denial of my appeal and sent me for an IME on August 28, 2020, with Dr. Raam Sambandam, a neurologist in Clermont, Florida (near where my mother resides).~~.~~

21. ~~Defendant RSLI pledged to send me the IME report as soon as it receives it. I have yet to receive the report.~~

22.1. ~~I am enrolled in two District of Columbia housing-assistance programs for the poor and disabled, but have not been able to move forward with purchasing a home this year because of defendants' actions depriving me of long-term disability income benefits I am entitled to.~~

23.1. ~~I've had to pay a great deal in credit-card interest this year because of defendants' actions depriving me of long-term disability income benefits I am entitled to.~~

23. ~~The financial strain and inability to purchase a home caused by defendants' actions have caused me a great deal of emotional distress, including an episode of suicidal depression August 18-22, 2020.~~ Defendant RSLI notified me September 16, 2020: "We have received the final Independent Medical Examination ("IME") report and completed our independent review of your file/the additional information submitted. It has been determined that the Claims Department's original determination to terminate your LTD claim should be reversed at this time. Your file has been referred back to [Examiner] Dana Brown[-Boyer] in our LTD Claims Department for ongoing adjudication." Pl. Ex. 17.

24. Dr. Sambandam's IME report completely contradicted the peer reviews conducted by Defendants Drs. Brodner and Jiva as well as the original finding January 29, 2020, by Defendant RSLI to terminate my disability benefits effective March 2020 and the first determination on appeal July 29, 2020, to sustain the original finding terminating my benefits. Pl. Ex. 18.

25. I immediately sent Defendant RSLI a demand for prompt payment due to me of $13,918.41 after federal income-tax withholding. Pl. Ex. 19.

26. Defendant RSLI deposited into my bank account $13,702.50 on September 19, 2020, a shortfall of $215.91 in interest due.

27. I filed September 17, 2020, an objection to one paragraph of Defendant RSLI's e-mail informing me it was reinstating my long-term disability benefits. I demanded RSLI revise the letter with five specific paragraphs ensuring I will be protected from its arbitrary and capricious decisionmaking in the future. Pl. Ex. 20.

28. I asked Defendant RSLI to respond by today (September 24, 2020). As of this filing, RSLI hasn't responded to my objection or agreed to the five paragraphs I demanded.

29. I sent Defendant RSLI's counsel a settlement proposal September 17, 2020. Mr. Moore has not responded to initiate settlement talks, therefore I must file this Second Amended Complaint.

30. The administrative record for this case is maintained by Defendant RSLI. It has yet to file that record with the Court. I e-mailed RSLI's counsel September 21, 2020, to inquire when it expects to file the administrative record. Mr. Moore replied he will not file it until after a Scheduling Conference has been held.

31. I filed September 22, 2020, a complaint against Defendant Dr. Brodner with the Florida Department of Health. Pl. Ex. 21. I incorporate all facts stated in my Florida Department of Health complaint into this Second Amended Complaint.

32. I filed September 22, 2020, a complaint against Defendant Dr. Jiva with the New York State Department of Health's Office of Professional Medical Conduct. Pl. Ex. 22. I incorporate all facts stated in my New York State Department of Health complaint into this Second Amended Complaint.

33. I am enrolled in two District of Columbia housing-assistance programs for the poor and disabled, but have not been able to move forward with purchasing a home this year because of defendants' actions depriving me of long-term disability income benefits I am entitled to. Obtaining a mortgage through these programs requires a minimum income level that I no longer met when RSLI illegally stripped me of my benefits effective March 2020 until restoration this month.

34. I've had to pay a great deal in credit-card interest this year because of Ddefendant RSLI'ss' actions depriving me of long-term disability income benefits I am entitled to.

24. The financial strain and inability to purchase a home caused by defendants' actions have caused me a great deal of emotional distress, including an episode of suicidal depression August 18-22, 2020.

35.

25.36. My brother, Justin Wall, is also diagnosed with Non-24-Hour Sleep/Wake Disorder and

Hypersom-nolence Disorder. "Along with witnessing Lucas' struggles firsthand, I also suffer from

the same conditions myself, so I'm in a unique position to offer insight for your understanding of

how disabling Non-24-Hour Sleep/Wake Disorder and Hypersomnolence Disorder are," he wrote.

Pl. Ex. 23.

### IV. CAUSES OF ACTION

**Count I: Demand for Payment of Interest, Costs & Fees, & ~~Denial~~ Judicial Relief to Ensure Continued ~~of~~ ~~Long-Term~~ TD~~Disability~~ Benefits under ERISA as Against Defendant RSLI**

26.37. **IMPROPER ~~DENIAL~~ TERMINATION OF CONTINUED BENEFITS:** Defendant RSLI terminated my

long-term disability benefits, which it had paid me from mid-2012 to February 2020, from March

2020 to September 2020 in violation of the policy terms. RSLI ~~has~~ presented no ~~substantial~~

evidence to contradict my contention that I remain Totally Disabled as my sleep disorders have

only worsened since my last claim review in 2017, as demonstrated by my sleep logs and data

graphs. Pl. Exs. 12 & 13.

38. Dr. Sambandam confirmed in his report on last month's IME that my sleep disorders have

worsened since the last IME I underwent in August 2017. Pl. Ex. 18.

39. Defendant RSLI reversed itself September 16, 2020, overturning its original finding of January 29

to terminate my disability benefits effective March 2020 and the first determination on appeal

July 29 to sustain the original finding terminating my benefits. Pl. Ex. 17.

27.40. The policy's terms constitute a contractual promise to provide specified benefits to

participants and beneficiaries pursuant to ERISA for a specified period of time. In my case, that's

until I reach the retirement age of 67. Pl. Ex. 1. ~~.~~

28. 41.  Defendant RSLI is required by ERISA to fully and fairly review a claim, which it has did not on original termination and initial appeal. It granted my claim in 2016, sustained it in 2017, and then terminated it in 2020 without any substantial evidence to overturn its previous two findings. The IME report by Dr. Sambandam proves my assertions. Pl. Ex. 18.

29. 42.  I am entitled to continue receiving these benefits until the retirement age of 67 because I have satisfied all conditions to be eligible and have not waived or otherwise relinquished my entitlement to these benefits.

43.  The benefits I already received for almost more than eight years are labeled "long-term disability" for a reason: They are meant to pay for a long-term, lifelong disability such as mine – as Defendant RSLI already agreed in its prior determinations in 2016 and 2017 (and now again in September 2020) to pay me these benefits for almost eight years.

44.  **RSLI OWES ME INTEREST ON 6 MONTHS OF ILLEGALLY WITHHELD BENEFITS:** Defendant RSLI has refused to pay me interest on the six months of long-term disability benefits (March to August 2020) it illegally did not pay me until this month. But interest is collectable pursuant to ERISA common law. RSLI has retained money that rightfully belonged to me as a beneficiary. To allow RSLI to retain the interest it earned on funds wrongfully withheld would be to approve of unjust enrichment.

45.  A "beneficiary of an ERISA plan may bring an action for interest on delayed benefits payments under section 502(a)(3)(B)" notwithstanding the lack of an express provision in ERISA to collect interest on wrongly denied benefits. The court based this right on its power to develop common law that "effectuates the statutory pattern enacted by Congress." *Fotta v. Trs. of the UMW Health & Ret. Fund of 1974*, 165 F.3d 209, 211-12 (3rd Cir. 1998).

46.  "As a general rule, prejudgment interest is to be awarded when the amount of the underlying liability [can be reasonably ascertained] and the relief granted would otherwise fall short of

making the claimant whole because he or she has been denied the use of the money which was legally due." *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3rd Cir. 1992).

47. A beneficiary is entitled to interest for wrongful denial of benefits even when the benefits were later restored by the insurance company before the court could issue a judgment.

48. A court should allow a beneficiary's claim for interest on denied benefits where the benefits were voluntarily restored, even though there was no underlying judgment upon which the court could make an award of "prejudgment interest." The Court of Appeals found that if interest was an appropriate remedy "to avoid unjust enrichment of a plan provider who wrongfully delays the payment of benefits, the award is appropriate whether a judgment is obtained or not." *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1007 (8th Cir. 2004).

49. "[T]he principles justifying prejudgment interest also justify an award of interest where benefits are delayed but paid without the beneficiary's having obtained judgment. The concerns … [about] making the claimant whole and preventing unjust enrichment are not diminished merely because the plan has paid the overdue benefits without the claimant having [prevailed in] litigation to secure payment. A late payment of benefits effectively deprives the beneficiary of the time value of his or her money whether or not the beneficiary secured the overdue benefits through judgment as the result of ERISA litigation." *Fotta* at 212.

~~30.~~50.  The D.C. Circuit held that prejudgment interest in presumptively available when benefits have been delayed. *Moore v. CapitalCare, Inc.*, 461 F.3d 1, 12 (D.C. Cir. 2006).

~~31.  In its decisions terminating my benefits, Defendant RSLI never addressed the combined effects of my illnesses, i.e. Non-24-Hour Sleep/Wake Disorder, Hypersomnolence Disorder, and Insomnia Disorder. Hypersomnolence Disorder and Insomnia Disorder are rarely, if ever, mentioned in RSLI's decisions.~~

~~32. To consider a single medical condition and ignore others is a denial of full and fair review under ERISA. *Duperry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 873 (4th Cir. 2011) (insurer must consider all evidence together); *Guthrie v. National Rural Elec. Coop. Assn. Long-Term Disability Plan*, 2007 U.S. App. LEXIS 28563 (4th Cir. 2007).~~

~~33. A refusal to consider co-morbid impairments and how disparate impairments might impact with one another and affect claimant's employability is arbitrary and capricious. *Laser v. Provident Life & Accid. Ins. Co.*, 211 F. Supp 2d 645, 655 (D.Md. 2002); *Buzzard v. Holland*, 2004 U.S. App LEXIS 8170 (4th Cir. 2004); *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005); *Kosiba v. Merck & Co.*, 384 F.2d 581 (3rd Cir. 2004).~~

~~34. A plan is required to consider all of a disabled claimant's impairments. *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670 (8th Cir. 2005). Further, an insurer who fails to consider all of a claimant's injuries in conjunction with one another took an adversarial approach. *Mood v. Prudential Ins. Co. of Am.*, 379 F.Supp.2d 267 (E.D.N.Y. 2005).~~

~~35.~~51. **MEDICAL EVIDENCE OF CONTINUED DISABILITY:** "The factors contributing to N24SWD in sighted individuals are chronic."~~.~~ Pl. Ex. 14.

~~36.~~52. "[T]reatment of individuals with N24SWD is particularly challenging and often unsuccessful. Once he was diagnosed with N24SWD, [Plaintiff] LEW was treated with melatonin, light therapy, and off-label Tasimelteon (Hetlioz®), among other therapeutic trials, all without success." *Id.*

53. Defendant RSLI acted in an arbitrary manner in relying on "peer reviews" of my medical records by Defendants Drs. Brodner and Jiva – who never examined me in person or even spoke to me on the phone – over the opinions of doctors who actually treated me as well as the two doctors who conducted ~~independent medical exam~~IME's~~s~~ of me in 2016 and 2017 at RSLI's behest.

~~37.~~

38. Defendant Dr. Brodner is not certified as a sleep specialist by the American Board of Sleep Medicine. Pl. Ex. 15.

~~39.~~ 54. Defendants Drs. Brodner and Jiva never examined my sleep logs and data graphs (Pl. Exs. 12 & 13) – the most critical documents when reviewing whether someone suffers from Non-24-Hour Sleep/Wake Disorder and Hypersomnolence Disorder. Pls. Ex. 7 & 9. Dr. Jiva even proclaimed I didn't keep sleep logs! Pl. Ex. 9. Defendant RSLI failed to appropriately respond to this unbelievable inaccurate assertion by Dr. Jiva, nor Dr. Brodner's failure to review my sleep logs and data graphs.

~~40.~~ 55. As part of a "full and fair review," ERISA regulations require that a review "takes into account all comments, documents, records, and other information submitted by the claimant …" 29 CFR § 2560-503(h)(2)(iv).

~~41.~~ 56. Defendant RSLI's reliance on overutilized paper reviewers who never met with me or spoke with me on the phone, fail~~ed~~ure to take into the account the entirety of the medical record, fail~~ed~~ure to review my sleep logs and data graphs, and fail~~ed~~ure to address the combination of my impairments is clearly arbitrary and capricious. — with RSLI, Dr. Brodner, and Dr. Jiva all operating under a clear conflict of interest.

~~42.~~ 57. "[I]t must be clear that the independent medical reviewer rendered a decision that is 'reliable.' *Black*, 538 U.S. at 834. … We think a 'reliable' opinion is one that includes an examination of all pertinent evidence. Here, however, we cannot conclude that Dr. Dean grappled with the evidence concerning Ms. Marcin's partial disability." *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir. 2017).

~~43.~~ 58. "In the case of [Plaintiff] LEW, independent medical reviewers were appointed by his insurance company in 2019 [Dr. Brodner] and 2020 [Dr. Jiva] to review his disability claim, but none of these physicians are qualified to issue an opinion on this orphan disease." Pl. Ex. 14.

59. Only when Defendant RSLI finally sent me for an IME on August 28, 2020 – 30 days after the 90-day deadline for issuing a final determination on my administrative appeal – did it finally have to face the music and accept the third independent doctor's agreement that my conditions have worsened and are not expected to improve. Pl. Ex. 18 (*see also* prior two IME reports at Pl Exs. 4 & 5.)

60. "The information [Mr. Wall] provided [at the August 28 IME] was consistent with the medical records provided. … He notes that his condition has worsened over the past 8 years. … Mr. Wall is unable to maintain a regular job given his abnormal sleep/wake cycle. His severe sleep disturbances result in excessive daytime hypersomnolence and mild psychological distress. Mr. Wall can sleep in excess of 3-4 days [of normal sleep] at time and may fall asleep at any point in a 24 hour day." Pl. Ex. 18.

44.61. Courts should give more weight to the opinion of a doctor who has actually examined a person over the insurance company's file-reviewing doctors. When it terminated my benefits, Defendant RSLI failed to appropriately consider the opinions of my treating physicians as well as the independent doctors who examined me in 2016 and 2017 – both of whom issued reports favorable to my disability claim. Pl Exs. 4 & 5.

45.62. "Taking into consideration what is scientifically known about N24SWD, its pathophysiology in sighted individuals, and possible therapeutic approaches, it is safe to assume that [Plaintiff] LEW has undergone and failed all therapeutic possibilities for N24SWD, thus proving to be therapy refractory." Pl. Ex. 14.

46.63. Many sighted Non-24 patients are permanently disabled as there is no treatment or cure for the disorder.

47.64. As another sufferer of Non-24-Hour Sleep/Wake Disorder, Robin Stewart, posted recently in an online support group: "I try to explain to people and doctors who don't understand that [having

13

Non-24] is like being an amputee. You don't expect your limb to just grow back, you accept that[] it's gone and you do what you can to move on with the life you have now[,] with the accommodations you need. … I don't expect my sleep to change back or the life I had before I had N24 to come back but I do what I can to live my life as normally as I can in my new normal." Pl. Ex. 16.

48.65. "Given that no new therapies have been developed for N24SWD since [Plaintiff] LEW's last therapeutic trial with Tasimelteon (Hetlioz®), and that no cure has thus been developed for N24SWD, termination of any insurance benefits cannot be supported by medical evidence." *Id*.

49.66. "In sum, considering that [Plaintiff] LEW was diagnosed with N24SWD, an orphan condition described in approximately 100 sighted patients, with no treatment guidelines for sighted individuals, no FDA approved therapies for sighted people, no known cure, and a largely unknown natural history; and that he was declared disabled because of said condition, termination of any insurance benefits cannot be supported by any scientific evidence." *Id*.

50.67. In its July 29 letter denying my appeal (Pl. Ex. 11), Defendant RSLI failed to refute numerous arguments and supplemental information that I submitted. *See* my appeal letters at Pl. Exs. 8 & 10. (Note: I have to date submitted 57 exhibits to RSLI during this year's appeal in addition to the 57 exhibits I submitted in 2015-16 during the initial claims review and appeal, for a total of 114 exhibits.)

51.68. When an insurance company fails to refute arguments and supplemental information submitted made by a claimant, the Court should treat those matters as conceded.

52.69. A claim denial/termination must address evidence favorable to the claimant "thoughtfully and at length." *Evans v. Eaton Corp.*, 514 F.3d 315, 323 (4th Cir. 2008).

53.70. An insurer's decision is not reasonable if it ignores the beneficiary's treating physician opinions while deferring to its own independent experts that fail to properly perform an assessment of a

claimant's work abilities and ignore material records submitted such as sleep logs and data graphs showing a condition is worsening, not improving or even stabilizing.

54.71. "[W]hile Reliance was not obligated to accord special deference to Ms. Marcin's physicians, its 'selective description of the medical evidence further undermines the reasonableness of its decision.'" *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir 2017).

55. To the extent there's any ambiguity in Defendant RSLI's decision, it should be construed against the insurance company. "The doctrine is applied to insurance contracts because insurance contracts are typically drafted by the insurance company, because insurance companies tend to be repeat players with greater expertise and experience in insurance matters than plan beneficiaries, and because beneficiaries have no opportunity for arms-length negotiation over the terms of the plan." *Nugent v. UNUM Life Ins. Co. of Am.*, 752 F. Supp. 2d 46 (D.D.C. 2010).

56. "[T]he law is clear that ambiguities in insurance contracts should be resolved in favor of the insured. *Columbia Cas. Co. v. Columbia Hosp.*, 633 F. Supp. 697, 700 (D.D.C. 1986), quoting *Continental Cas. Co. v. Beelar*, 405 F.2d 377, 378 (D.C. Cir. 1968)." *Marcin v. Reliance Standard Life Ins. Co.*, No. 10-cv-1816 at 28 n. 10 (D.D.C. September 28, 2012).

57.72. **DISAGREEMENT WITH SOCIAL SECURITY ADMINISTRATION:** Defendant RSLI's decision to terminate my long-term disability benefits directly contradicteds the legal judgment of the Social Security Administration that I am Totally Disabled.

58.73. Where an administrator encourages a beneficiary to apply for Social Security Disability benefits and directly profits benefits from the award of those benefits by reducing payments owed to beneficiaries (such as in this case), the claim administrator's failure to consider the agency's finding of disability may bear on the propriety of its decision to deny of terminate benefits. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008); *see also Elliott v. Sarsah Lee Corp*, 100 F. Supp.2d 458, 468 (W.D.Va. 2000).

15

59.74. "The Court finds that it cannot defer to Reliance's decision to deny benefits as reasonable, given Reliance's failure to address, or even to acknowledge, the Social Security Administration's May 28, 2010, determination that plaintiff had been disabled since August 20, 2007." *Marcin v. Reliance Standard Life Ins. Co.*, No. 13-cv-1308, Dkt. 43 at 10 (D.D.C.).

60.75. "[A]n SSA determination, though certainly not binding, is far from meaningless." *Id.* at 10-11, quoting from *Wooden v. Alcoa, Inc.*, 511 F. Appx 477, 484 (6th Cir. 2013).

61.76. "[I]t might be unreasonable for an insurer 'to ignore a favorable SSA decision' that has already been rendered." *Id.* at 11, quoting from *Brown*, 12. F.Supp.3d at 99 n. 20.

77. **DISAGREEMENT WITH PREVIOUS RSLI DETERMINATIONS:** The cumulative medical records, including my sleep logs and data graphs kept at the direction of sleep specialists since 2009, reveal there has never been any improvement in my conditions. They have only gotten worse since Defendant RSLI approved my claim in 2016 and sustained my benefits in 2017.

62.78. Dr. Sambandam confirmed this in his report of my August 28, 2020, IME: "On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

63.79. An administrator must give a reasoned explanation for why a beneficiary is subsequently denied benefits following an initial approval. *Anderson v. Reliance Standard Life Ins. Co.*, 2013 WL 1190782 (D.Md. 2013); *Patel v. United of Omaha Life Ins. Co.*, 2013 WL 212863 (D.Md. 2013).

64.80. Similarly, it has been held that "reversal of a decision of disability may warrant significant skepticism when substantial evidence does not support the conclusion that disability has ceased." *Smith v. Continental Cas. Co.*, 276 F.Supp.2d 447, 460 (D.Md. 2003), *vacated on other grounds*, 369 F.3d 412 (4th Cir. 2004). *See also Ulsaker v. Lincoln Nat. Life Ins. Co.*, 2011 WL 4621030 (E.D.Va. 2011).

81. **VIOLATION OF ERISA:** Defendant RSLI's action terminating my long-term disability benefits from March to September 2020 without cause constitutes a violation of ERISA.

65. 82. Although Defendant RSLI has now belatedly partially remedied that violation by paying me the benefits I was due from March to September 2020, I demand equitable relief under ERISA to ensure this illegal action never happens in the future and to compensate me for the damages I have incurred because of the illegal act.

66. 83. Defendant RSLI deliberately, intentionally, in bad faith, and without legal justification or excuse denied me for six months the benefits conferred by the express terms of the plan – benefits it had already paid for me since 2012.

67. 84. Defendant RSLI has a duty to ensure that the plan is administered in accord with its terms.

68. 85. Defendant RSLI breached its duty.

86. I have been harmed thereby.

87. Defendant RSLI is likely to breach its duty again in the future.

69. 88. I would be irreparably harmed by any similar future breach.

70. 89. The actions of Defendant RSLI as stated herein constitute actionable violations of ERISA for which equitable and other relief is available from this Court.

71. 90. Under ERISA § 404(a), aA fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of: … providing benefits to participants and their beneficiaries … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims … in accordance with the documents and instruments governing the plan." 29 USC § 1104(a)(1).

91. Defendant RSLI has failed to demonstrate that its decision to terminate my long-term disability benefits was the result of a deliberate, principled, and reasonable process.

92. There is great danger Defendant RSLI will repeat its conduct in future years as it has a profit motive to terminate my long-term disability benefits.

~~72.~~93. Its past conduct show the Court that Defendant RSLI can be expected to act again in the future to end my benefits without just cause.

94. **ADMINISTRATIVE REMEDIES EXHAUSTED:** As of July 29, 2020, I exhausted all administrative ~~appeals~~ remedies under the plan when the 90-day deadline to make a final determination on my appeal lapsed.~~.~~

95. Defendant RSLI has argued to the contrary because my administrative appeal denial was being reconsidered.

~~73.~~96. However, now that my final appeal determination was made September 16, there can't be any dispute as to this material fact that I have exhausted all administrative remedies. Pl. Ex. 17.

~~74. Although Defendant RSLI agreed in early August of this year to reconsider its July 29 denial of my appeal, federal regulations govern timelines for a long-term disability insurer to adjudicate an appeal of an advertise benefit termination: "[T]his section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries…" 29 CFR § 2560.503-1(a).~~

~~75. I filed an appeal with Defendant RSLI on April 30, 2020. Dkt. 7 at Ex. 1. The policy and federal regulations require a final determination be made no later than 90 days after filing. This deadline was July 29, 2020, the same day Defendant RSLI sent me an appeal denial letter. *Id.*~~

~~76. Even though Defendant RSLI later agreed to reconsider its appeal denial by sending me for an independent medical exam on August 28, I exhausted my administrative remedies when the 90-day appeal deadline expired July 29. The 90-day deadline is established in the plan documents in accordance with U.S. Department of Labor rules: "[C]laims involving disability benefits … shall be~~

governed by paragraph (i)(1)(i) of this section, except that a period of 45 days shall apply instead of 60 days for the purposes of that paragraph." 29 CFR § 2560.503-1(i)(3)(i).

77. Once that total 90 day review period ended July 29 with an upholding of the original benefit termination decision, legally the established administrative process was concluded even if Defendant RSLI voluntarily agreed to reconsider the matter later. Thus my Amended Complaint is ripe for this Court's adjudication: "[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(Λ) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits." 29 CFR § 2560.503-1(l)(1).

78. "In the case of a claim for disability benefits, if the plan fails to strictly adhere to all the requirements of this section with respect to a claim, the claimant is deemed to have exhausted the administrative remedies available under the plan... Accordingly, the claimant is entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim..." 29 CFR § 2560.503-1(l)(2)(i).

79. A claimant may bring a civil action at any time when his claim has been deemed denied by the regulations just as he may bring an action to challenge an outright denial of benefits. *University of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n. 3 (6th Cir. 2000); *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 144 (1985).

80. Failure to follow the established ERISA guidelines and reasonable claim procedures shall result in a deemed exhaustion of administrative remedies under the plan and entitlement to pursue a

remeds under ERISA. *Nat'l Cable & Telecommunications Assn. v. Brand X Internet Services*, 125 S.Ct. 2688 (2005) citing 29 CFR § 2560.503-1(l).

81.97. **RIGHT TO SUE:** ERISA permits the beneficiary of an employee welfare benefit plan to sue for a judgment as to: A) *entitlement to* past and *future benefits*; B) recover benefits due him under the terms of the plan; C) *enforce his rights under the terms of the plan*; D) *clarify his rights to future benefits under the terms of the plan*; and E) *for other appropriate equitable or legal relief*. 29 USC § 1132. (emphasis added noting those that apply to my causes of action).

82.98. ERISA § 502(a)(3) also provides that a participant may seek to enjoin any act or practice that violates any provision of law or the terms of the plan. A participant may also seek other appropriate equitable relief to redress such violations and/or to enforce the terms of the plan. 29 U.S.C. § 1132(a)(3).

83.99. "The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action." 29 U.S.C. § 1132(f). "The term 'other appropriate equitable relief' implies a broad range of remedies. We adhere to the principle 'endorsed repeatedly ... by the federal judiciary' that 'when Congress uses broad generalized language in a remedial statute, and that language is not contravened by authoritative legislative history, a court should interpret the provision generously so as to effectuate the important congressional goals.' *Cia Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 428 (1st Cir. 1985) (footnote omitted). One of the important goals of ERISA is to make certain that participants and beneficiaries not be deprived of the full value of their plan benefits by a fiduciary's breach of a contractual duty." *Warren v. Society National Bank*, 905 F.2d 975 (9th Cir. 1990).

100.  "The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action." 29 U.S.C. § 1132(f).

~~84.~~101.  **RIGHT TO COSTS & ~~ATTORNEY'S~~ FEES:** "In any action under this subchapter … by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 USC § 1132(g)(1).

~~85.~~102.  To be entitled to attorney's fees, the Supreme Court held (in a case that involved Defendant RSLI) that a party need only establish "some success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010).

~~86.~~103.  In deciding to make a decision terminating benefits it had already paid me for almost eight years, Defendant RSLI was influenced by its financial conflict of interest, based on its funding of the benefits that should be continued.

~~87.~~104.  Defendant RSLI enriched its own coffers to my detriment through the wrongful termination of benefits.

~~88.~~105.  If I elect to continue proceeding *pro se*, RSLI should pay fees to me in lieu of an attorney for the time I have spent litigating this matter.

~~89.~~106.  **STANDARD OF REVIEW:** The appropriate standard of review in this case is ~~is~~ *de novo*.

~~90.~~107.  Because Defendant RSLI both determines eligibility for benefits under the policy and pays such benefits, it acts under a conflict of interest. "There is an actual, readily apparent conflict here, not a mere potential for one" when the insurance company acts both as plan administrator and ultimately pays the benefits. *Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, 527 (6th Cir. 2003), quoting from *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998).

~~91.~~108.  The ~~U.S.~~ Supreme Court held in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2243 (2008) that ~~when courts consider cases where the ERISA decisonmaker also has a financial interest in the case,~~

21

~~such as when an insurance company both makes a decision and would pay any benefits due out~~ ~~of its own funds, this creates a conflict of interest.  The Court held that~~ where a plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pockets," that dual role creates a conflict of interest.

~~92.~~109.  "Importantly, however, there is an inherent conflict of interest that arises when a plan administrator both evaluates claims for benefits and pays those benefits. *Glenn*, 554 U.S. at 112. The Supreme Court has explained that this conflict of interest is a 'factor' to be considered and that 'any one factor will act as a tiebreaker when the other factors are closely balanced.' *Id.* at 117." *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir. 2017).

~~93.~~110.  "While the factors to be examined in any ERISA case will vary based on the factual circumstances, *Glenn* makes it clear that the conflict of interest factor must be evaluated alongside these other determinations. Thus, when reviewing the lawfulness of Reliance's decision to deny disability benefits, we must remember the conflict of interest factor and weigh it appropriately." *Id*.

~~94.~~111.  An inherent conflict of interest exists when an insurer both determines plan eligibility and issues benefits, creating a "perpetual conflict with [a] profit-making role as a business." *Pinto vs. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 384 (3rd Cir. 2000). *See also Lemaire v. Hart Life & Accident Ins. Co.,* 69 F. Appx 88, 91 (3rd Cir. 2003); *Evans v. Metro. Life Ins. Co.*, 358 F.3d 307, 311 (4th Cir. 2004); *Anderson v. Cytec Indus.,* 619 F.3d 505 (5th Cir. 2010); *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311 (6th Cir. 2010); *Murphy v. Deloitte & Touche Grp. Ins. Plan,* 619 F.3d 1151 (10th Cir. 2010); and *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1552 (11th Cir. 1994).

~~95.~~112.  When a court finds a conflict of interest, it must review decisions *de novo*. *Armstrong v. Aetna Life Ins. Co*., 128 F.3d 1263, 1265 (8th Cir. 1997).

96.113.  When a court considers a denial or termination of benefits *de novo*, the examining court interprets the governing plan documents without any deference to interpretation by the insurance company. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989).

114.  Even under the less-rigorous "deferential review" standard that does not apply in this case, courts have held that the plan administrator's determination must be supported by substantial evidence to be sustained. *Buzzard v. Holland*, 367 F.3d 263, 268-69 (4th Cir. 2004).

115.  In this case, Defendant RSLI did not ~~has not~~ present~~ed~~ ***any*** evidence showing that my sleep disorders ~~have~~ improved since my claim was granted in 2016 and sustained in 2017 after ~~independent medical exam~~IME's. In fact, they worsened.

97.116.  As Dr. Sambandam concluded in his report of my August 28, 2020, IME: "On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

98.117.  "The insurer should not be permitted to profit by its own wrong." *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 202 (Cal. 1958).

99.118.  **CONGRESSIONAL INTENT:** Congressional intent is for courts to fashion remedies for ERISA violations that not only protect participants and beneficiaries but deter violations of the law as well. H.R. REP. 101-386 at 433 (1989) (Conf. Rep.), reprinted in 1989 U.S.C.C.A.N. 3018, 3036, cited in *Kifafi v. Hilton Hotels Retirement Plan*, 701 F.3d 718, 728 (D.C. Cir. 2012).

**Count II: Bad Faith as Against All Defendants**

100.119.**GENERAL DEFINITIONS:** Bad faith is dishonesty or fraud in a transaction. It might involve an intent to deceive or mislead another in order to gain some advantage. It is often related to a

breach of an obligation inherent in all contracts to deal with the other parties in good faith and with fair dealing, such as in timely paying claims due under an insurance policy.

101.120. Bad faith describes a tort claim that an insured person has against an insurance company for its bad acts. Insurance companies owe a duty of good faith and fair dealing to the persons they insure. This duty is often referred to as the implied covenant of good faith and fair dealing. This exists by operation of law in every insurance contract. If an insurance company violates that covenant, the insured person has a claim for bad faith. A plaintiff in an insurance bad-faith case may be able to recover an amount larger than the original face value of the policy if the insurance company's conduct was particularly egregious.

102.121. Insurance companies are required by law to act in good faith and deal fairly with policyholders. They must do so by following through on the agreed-upon duties they have promised to beneficiaries, since they entered into a contract (policy) with them. This includes the duty of paying claims and doing so promptly. If an insurance company does not comply and breaches their its duty, their its acts are dishonest and deceptive, and considered to be bad faith.

103.122. An insurance company acts improperly, or in bad faith, when handling a claim when it, among other actions: A) fails to adequately investigate a claim; and B) terminates benefits it has already been paying without substantial evidence that the beneficiary no longer meets the policy's terms for continual coverage.

104.123. "The bad faith tort is grounded on the covenant of good faith and fair dealing that is implicit in all contracts, supplemented by the idea that insurance contracts have special characteristics that warrant heightened liability for breach of that covenant. *See Braesch v. Union Ins. Co.*, 237 Neb. 44, 464 N.W.2d 769, 774-75 (1991) (noting the unique 'public interest' character of the insurance industry, the fact that an insured seeks to protect against loss rather than gain commercial advantage, and the unequal bargaining power of insurers and insureds); *see also*

24

*Kranzush v. Badger State Mut. Casualty Co.*, 103 Wis.2d 56, 307 N.W.2d 256, 261 (1981) ('The heart of the [bad faith] tort … is the fiduciary relationship between the insurer and the insured and the insurer's breach of the duty of good faith and fair dealing implicit in every contract.')." *Messina v. Nationwide Mut. Ins. Co.,* 998 F.2d 2 (D.C. Cir. 1993).

~~105.~~124.**RSLI's PRIOR ACTS OF BAD FAITH:** A defendant's prior acts of bad faith enlighten the examination of any current cause of action for similar misconduct.

125.  Defendant RSLI has a poor track record in the federal courts of exhaustively litigating against disability claimants but losing – sometimes accruing many more times in attorneys' fees and costs than what it should have paid to the beneficiaries in the first place.

~~106.~~126.Defendant RSLI litigated my claims before this Court from July 30 to September 16, even filing a Motion to Dismiss Plaintiff's Claims (Dkt. 3), before reversing itself and paying my past-due benefits from March to September 2020 on September 19. Such an action shows how RSLI's posture in this litigation has been in bad faith, as were its January 29, 2020, and July 29, 2020, decisions to terminate my long-term disability benefits without cause.

~~107.~~127.For two other recent examples in this Court of Defendant RSLI's wrongdoing, see *Marcin v. Reliance Standard Life Ins. Co.*, No. 13-cv-1308 (D.D.C. October 14, 2015) (affirmed No. 16-7125 (D.C. Cir. 2017)), and *Boster v. Reliance Standard Life Ins. Co.*, No. 12-cv-980 (D.D.C. August 8, 2013).

~~108.~~128.*Marcin* is an especially outrageous example of Defendant RSLI's bad-faith dealings with disability beneficiaries. RSLI denied Ms. Marcin's original benefit claim June 11, 2008, then spent more than seven years battling against her before this Court finally issued a judgment in her favor October 14, 2015.

~~109.~~129."[T]he Court finds that the insurer's decision cannot be sustained. The record in this case does not contain substantial support for the insurer's finding that she was capable of working full-

time when she stopped working, and that is the basis upon which it denied her claim for benefits." *Marcin* at 2. "[T]he Court finds that Reliance's determination was not reasonable and cannot be upheld." *Id.* at 18. "Reliance's selective description of the medical evidence further undermines the reasonableness of its decision." *Id.* at 22.

110.130. RSLI then continued fighting Ms. Marcin, despite the judgment entered against it, resulting in a September 19, 2016, filing informing the Court it would not pay her a penny. *Marcin* at Dkt. 64 "Defendants' Notice of Decision on Remand."

111.131. Defendant RSLI appealed to the U.S. Court of Appeals for the District of Columbia Circuit, which affirmed the judgment against it on June 30, 2017 – meaning poor disabled Ms. Marcin had to fight RSLI more than ***nine years*** to obtain the benefits she was entitled to her under policy.

112.132. The partial and selective medical reviews undertaken by Defendants Dr. Brodner and Jiva at the behest of Defendant RSLI demonstrates RSLI's ongoing effort to deny benefits by any means necessary – even accepting totally false "peer reviews" as true.

133. In my case, all four "peer reviews" conducted by Defendant RSLI have been discredited by the three independent doctors who have examined me in person. Pl. Exs. 4, 5, & 18.

134. Most recently, contradicting all the key findings of Defendants Drs. Brodner and Jiva – which Defendant RSLI relied upon on its wrong decisions to terminate my disability benefits January 29 and again July 29 of this year – Dr. Sambandam concluded: "Mr. Wall cannot function in a routine of any meaningful manner due to the unpredictability of his sleep schedule. Mr. Wall cannot work in a full-time capacity from 11/10/2019 onward." Pl. Ex. 18. (RSLI's selection of November 10, 2019, as a date for Dr. Sambandam to evaluate my conditions is mysterious as this date has no relevance to my sleep disorders.)

113.135. Federal courts have often admonished Defendant RSLI for malfeasanceisconduct in claim reviews. *See*, e.g., *Taylor v. Reliance Standard Life Ins. Co.*, 2011 WL 3881488 (W.D.Wash. 2011);

*Cyr v. Reliance Standard Life Ins. Co.*, 2011 WL 3793776 (9th Cir. 2011); *Kochenderfer v. Reliance Standard Life Ins. Co.*, 2009 WL 47228321 (S.D.Cal. 2009); and *MacLeod v. Reliance Standard Life Ins. Co.*, 2010 WL 597005 (D.N.H. 2010).

~~114.~~136. **RSLI'S BAD FAITH IN MY CASE:** Defendant RSLI is guilty of particularly egregious bad faith for failing to properly determine that my sleep disorders have worsened since my claim for long-term disability benefits was approved in 2016 and reapproved in 2017. RSLI failed to thoroughly investigate my worsening medical conditions before ~~unreasonably~~ illegally terminating my claim in January 2020 and upholding that termination six months later on appeal.~~.~~

~~115.~~137. Defendant RSLI ~~has~~ unreasonably delayed for six months payment of benefits I ~~was~~am due under the policy, causing me great financial strain, credit-card interest payments, delayed purchase of a home, and enormous emotional distress, among other injuries.~~.~~

138. Defendant RSLI acted in bad faith by pledging twice, in 2019 and again in 2020, to send me for an ~~independent medical exam~~IME as part of its ongoing review of my claim and then as part of its initial review of my appeal – but then never sending me for such an exam until a month after the 90-day deadline for making a final determination of my appeal. Pl. Ex. 24.

~~116.~~139. Dr. Sambandam's report of my August 28, 2020, IME makes it crystal clear exactly why Defendant RSLI didn't want to send me for such an exam. RSLI knew any competent physician examining me would reach the same conclusion Dr. Sambandam did: "The prognosis is poor in this case. Mr. Wall cannot function in a routine of any meaningful manner due to the unpredictability of his sleep schedule. … Mr. Wall cannot work in a full-time capacity from 11/10/2019 onward. On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

~~117.~~140. The claim termination in my case ~~was~~is not the result of a reasoned and principled decisionmaking process. Rather, Defendant RSLI ~~has taken~~took an unprincipled and irrational

course to a predetermined result of benefits denial based on its conflicts of interest. This conduct should result in lessened deference given to the decisions by RSLI as well as the recommendations made by Defendants Drs. Brodner and Jiva.

118.141. "While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 636 (10th Cir. 2003).

119.142. "If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006), quoting from *Hais v. Smith*, 547 A.2d 986, 987-88 (D.C. 1988).

143. **INSURANCE & CONTRACT LAW:** State laws ~~regarding~~ regulating insurance are the chief exception to the broad sweep of ERISA's pre-emption requirements. State laws regulating insurance fall under ERISA's "savings clause": "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 USC § 1144(b)(2)(A).

120.144. The Supreme Court has instructed that the "presumption is against preemption, and we are not inclined to read limitations into federal statutes in order to enlarge their preemptive scope." *Metropolitan life Ins. Co. v. Massachusetts*, 471 U.S. 724, 741 (1985). It also noted that Congress did not intend to preempt areas of traditional state regulation. *Id.* at 740.

121.145. Defendant RSLI is based in Pennsylvania. Its bad-faith conduct violates that state's insurance law regarding unfair claim determination practices: "In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim

was made by the insured in an amount equal to the prime rate of interest plus 3%. (2) Award

punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer."

42 Pa. C.S. § 8371.

146.  Pennsylvania's law falls within ERISA's "savings clause" because it meets the Supreme Court's

requirement that "in order to regulate insurance, a law must not just have an impact on the

insurance industry, but be specifically directed toward that industry." *Pilot Life Ins. Co. v. Dedeaux,*

481 U.S. 41, 50 (1987).

147.  With respect to the issue of congressional intent, the Supreme Court's analysis starts with a

presumption against pre-emption. Congress did not intend to pre-empt areas of traditional state

regulation (such as insurance) absent evidence that it was the clear and manifest purpose of

Congress. *California Division of Labor Standards Enforcement v. Dillingham*, 519 U.S. 316, 325

(1997).

~~122.~~148. The Pennsylvania statute authorizing punitive damages against an insurance company acting

in bad faith is based on the development of punitive damages in the United States as a means of

punishing a defendant bad actor in cases where the civil award was deemed insufficient to punish

the defendant.

149.  In this case, merely paying me the benefits it was legally obligated to pay me under the policy

from March to September 2020 is not a sufficient action to punish Defendant RSLI's misbehavior.

~~123.~~150. ~~This~~ An extra ~~—~~ level of punishment is appropriate in this case because ~~merely ordering~~

~~Defendant RSLI to pay me the long term disability benefits I should have received based on the~~

~~approval of my claim in 2016 and upholding of my claim in 2017 does~~ restoring benefits I should

have received in the first place does not suffice to punish RSLI for its malicious, wanton,

intentional, outrageous, and reckless decision to terminate my benefits effective March 2020 with

no substantial evidence to overturn its two previous decisions that I'm Totally Disabled. Punitive

29

damages thus must be awarded to me under the Pennsylvania statute to punish the wrongdoer for its bad conduct and deter such conduct by RSLI and other insurance companies toward other disabled beneficiaries in the future.

~~124.~~151. The unavailability of punitive damages under certain federal laws such as ERISA does not necessarily foreclose a plaintiff from seeking punitive damages through concurrent claims such as a state law regulating insurance that is not pre-empted.

~~125.~~152. The operative question is determining whether a state law is excepted from pre-emption under ERISA's savings clause is whether it regulates insurance. *UNUM Life Ins. Co. v. Ward*, 526 U.S. 358, 367-68 (1999). Clearly the Pennsylvania statute regulates insurance as it is strictly written to govern "an action arising under an insurance policy." The Court need not look beyond the plain meaning of the statute.

~~126. The Supreme Court has recognized the presumption that Congress did not intend to pre-empt areas of traditional state regulation such as insurance. *Metro. Life. Ins. Co. v. Massachusetts*, 471 U.S. 724, 740 (1985).~~

~~127. "A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987).~~

~~128.~~153. Insurance regulation occurs almost exclusively at the state level. Insurance companies are required to submit to state regulatory oversight in every jurisdiction in which they are licensed to operate.

~~129.~~154. "[T]o recover in a bad faith action, the plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364 (Pa. 2017).

155. Defendant RSLI, by reversing its two prior terminations of my long-term disability benefits September 16, 2020, admits ~~did~~ it did not have a reasonable basis for denying benefits under the policy and it knew of or recklessly disregarded its lack of a reasonable basis by failing to send me for an IME earlier than 30 days after the 90-day deadline to render a final appeal decision.

~~130.~~156. RSLI in fact had pledged twice in 2019 and 2020 to send me for an IME, but never did so, knowing that no competent doctor examining me would issue a finding of anything other than "Totally Disabled." Pl. Ex. 24.~~.~~

~~131.~~157. The good-faith obligation of an insurer requires it go beyond the letter of the insurance policy and act fairly and reasonably in processing, investigating, evaluating, and paying a claim. The evidence shows Defendant RSLI did none of the above.

~~132.~~158. "'Bad faith' on part of the insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e. good faith and fair dealing) through some motive of self-interest or ill will …" *Rancosky*~~Id.~~, quoting from the 6th Edition of *Black's Law Dictionary*.

~~133.~~159. "[W]e hold that proof of an insurer's motive of self-interest or ill-will, while potentially probative … is not a mandatory prerequisite to bad faith recovery under Section 8371." *Id.*

~~134.~~160. In addition to the Pennsylvania statute, pre-judgment interest recovery is also available as equitable relief under ERISA, as discussed above. *See also* ~~-~~*Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 209-10 (3rd Cir. 2004)~~;~~ and *Cottrill v. Sparrow, Johnson, & Ursillo, Inc.*, 100 F.3d 200, 225 (1st Cir. 1996).

~~135.~~161. The insurer's implied duty of good faith is just one instance of the covenant that exists "in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." In the insurance context, the duty requires that the

"insurer, in deciding whether a claim should be compromised, must take into account the interest of the insured and give it at least as much consideration as it does to its own interest." *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 201 (Cal. 1958).

162. In addition to the Pennsylvania law that is not pre-empted by ERISA, ERISA itself provides that compensatory damages may be awarded under certain circumstances. ~~*See*, e.g., *Warren v. Soc'y Nat'l Bank*, 905 F.2d 975, 980 (6th Cir. 1990).~~

"Justice Brennan stated that section 502(a)(3) provides for an award of 'appropriate equitable relief' for acts or practices that violate any provision of ERISA or the terms of a retirement plan. *Id.* at 153, 105 S.Ct. at 3096. Therefore, a beneficiary may obtain 'appropriate equitable relief' whenever an administrator breaches the fiduciary duties set forth in section 404(a). *Id.* at 154, 105 S.Ct. at 3096." *Warren v. Soc'y Nat'l Bank*, 905 F.2d 975~~, 980~~ (6th Cir. 1990).~~.~~

~~136.~~163.

164. "Finding that 'Congress intended by Sec. 404(a) to incorporate the fiduciary standards of trust law into ERISA,' he would apply in ERISA cases 'black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits.' *Id.* at 152-53, 105 S.Ct. at 3095-96 (footnote omitted). Under the law of trusts, 'a beneficiary [is] entitled to a remedy 'which will put him in the position in which he would have been if the trustee had not committed the breach of trust.' ' *Id.* at 157 n. 16, 105 S. Ct. at 3098 n. 16 (quoting *Restatement (Second) of Trusts* Sec. 205, and Comment a (1959)). Therefore, construing sections 404(a) and 502(a)(3) together, a beneficiary may obtain 'appropriate equitable relief' for breach of fiduciary duties, and such equitable remedies 'include provision of monetary damages.' *Id.* at 154 n. 10, 105 S. Ct. at 3096 n. 10." *Id.*

165. By acting negligently and in its own interest, Defendant RSLI violated its contractual duty to pay my benefits on time. It therefore violated the "prudent man" standard of care under ERISA §

404(a). That exposes RSLI to additional damages beyond simply having to pay benefits that it should have paid to start with. *Id*.

166.  The injuries I have suffered – including paying extra interest on credit-card debts, having to defer purchase of a home although I qualified for two District of Columbia assistance programs for the poor and disabled, pain and suffering, mental anguish, *et. al*. – are direct injuries resulting from Defendant RSLI's bad-faith breach of contract. Therefore, my claims are contractual and not extracontractual.

167.  "The question before this court is whether section 502(a)(3) – part of a 'carefully integrated' enforcement scheme – permits the recovery of compensatory damages to redress a direct injury to a participant by a fiduciary that allegedly violated its contractual duty under the terms of the retirement plans and under the provisions of ERISA. … Given that Congress intended to incorporate the fiduciary standards of trust law into ERISA, it is proper to apply 'black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits.' Under the law of trusts, 'a beneficiary is entitled to a remedy 'which will put him in the position in which he would have been if the trustee had not committed the breach of trust.' ' '[O]ther appropriate equitable relief' under section 502(a)(3), for breach of fiduciary duties set forth in section 404(a), includes the provision of monetary damages." *Id*.

168.  "[U]nder the law of trusts, a beneficiary is entitled to a remedy that will put him in the position he would have been in if the fiduciary had not committed a breach of trust, and that such a remedy includes monetary damages. … Our position is supported by decisions of other courts of appeals finding that equitable relief includes monetary damages where required to afford complete relief. It is the historic purpose of equity to secure complete justice, and courts may adjust their remedies so as to grant the necessary relief." *Id.*

137.169.Policyholders in the District of Columbia may sue their insurers for a breach of the implied contractual covenant of good faith and fair dealing, despite the fact that D.C. does not recognize the tort of bad faith refusal to pay insurance benefits. *Nugent v. UNUM Life Ins. Co. of Am.*, 752 F. Supp. 2d 46 (D.D.C. 2010).

138.170.In *Nugent*, this Court first held that a claim for breach of the implied contractual covenant of good faith and fair dealing is entirely separate from a bad-faith claim based in tort. Under D.C. law, all contracting parties are charged with an implied duty of good faith and fair dealing, and that duty is breached when one of the parties "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id*. This Court found that the plaintiff's allegations – that the insurer acted or failed to act in a way that injured or destroyed her rights under the insurance contract – properly stated a claim for beach of the implied covenant of good faith and fair dealing.

139.171."An insurance policy establishes a contractual relationship between the company and its policy holder. Under District of Columbia law, every contract contains within it an implied covenant of both parties to act in good faith and damages may be recovered for its breach as part of a contract action. … Disputes relating to the respective obligations of the parties to an insurance contract should generally be addressed within the principles of law relating to contracts, and bad faith conduct can be compensated within those principles." *Choharis v. State Farm Fire & Casualty Co.*, No. 06-CV-234 (D.C. 2008).

140.172."Under D.C. law, the elements required to prevail on a breach of contract are '(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.'" *Camarda v. Certified Financial Planner Board of Standards, Inc.,* No. 15-7080 (D.C. Cir. 2016), quoting from *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

173. "Under D.C. law, 'all contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.*, quoting from *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (internal quotation marks omitted).

~~141.~~174. "In light of the plain language of the statute, the common law of trusts, and the role of courts in equity, we find that the damages sought … are recoverable as 'other appropriate equitable relief' under section 502(a)(3)(B)(i)." *Warren v. Society National Bank*, 905 F.2d 975 (9th Cir. 1990).

~~142.~~ **BAD FAITH BY DR~~S~~. BRODNER ~~& JIVA~~** ~~Even if ERISA pre-emption blocks enforcement of the Pennsylvania statute against RSLI, ERISA does not apply to my bad faith cause of action against Defendants Drs. Brodner and Jiva.~~

175. I incorporate all arguments concerning Dr. Brodner's bad faith from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

176. **BAD FAITH BY DR. JIVA:** I incorporate all arguments concerning Dr. Jiva's bad faith from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

~~143. The Pennsylvania statute does not apply to Defendants Drs. Brodner and Jiva since it relates only to insurance companies.~~

~~144. Defendants Drs. Brodner and Jiva, however, are guilty of common law bad faith in their faulty medical reports — and for accepting such report assignments from Defendant RSLI without expertise in the field of Circadian Rhythm Sleep Disorders.~~

~~145. "Decisions made about [Plaintiff] LEW's disability claim based on medical assessments performed by anyone other than an expert in the orphan disease of N24SWD, is, in my professional opinion, negligent, injudicious, and ignorant." Pl. Ex. 14.~~

146.  Defendant Dr. Brodner is not even certified as a sleep specialist by the American Board of Sleep Medicine. Pl. Ex. 15.

147.  Dr. Brodner lied when signing a statement on Page 13 of his peer review attesting that "I declare that the information contained in this report was prepared by and is the work product of the undersigned *and is true to the best of my knowledge and information*." Pl. Ex. 7 (emphasis added). As my notes on his report indicate, Dr. Brodner absolutely did not prepare a true report. *Id.*

148.  Dr. Jiva lied when he signed a statement on Page 9 of his peer review attesting that "I have personally reviewed all of the documents presented to me." Pl. Ex. 9. But Dr. Jiva never reviewed my sleep logs and data graphs; he actually made the outrageous, reckless statement that I don't even keep sleep logs despite the fact they are in the claim file dating back to 2009! *Id.*

149.  Defendants Drs. Brodner and Jiva sent Defendant RSLI reports unfavorable to the continuation of my disability benefits, despite overwhelming evidence in my medical records to the contrary, in bad faith in hopes of obtaining more business from RSLI for future peer reviews and/or independent medical exams.

150.177.**ALL DEFENDANTS ARE GUILTY OF BAD FAITH:** All three defendants acted in bad faith by dishonestly reviewing my medical records and previous determinations by my physicians, and independent medical examiners, and the Social Security Administration that I remain Totally Disabled.

178.  All three defendants knowingly misrepresented my medical conditions to reach a conclusion that my benefits should be terminated. The facts actually show show my conditions have ***worsened*** since the last independent medical exam IME took place in 2017, after which Defendant RSLI continued my benefits until their a sudden termination effective February March of this year. Pl. Exs. 12 & 13.

179. Dr. Sambandam confirmed that my sleep disorders have worsened, proving my allegations of bad faith against all three defendants: "On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be able to function in a work capacity in the future." Pl. Ex. 18.

~~151.~~

~~152.~~180. All defendants breached their obligations to deal with my continued disability claim in good faith and with fair dealing.

181. All defendants failed to thoroughly investigate the worsening of my sleep disorders since the last ~~independent medical exam~~IME was conducted in 2017. The sleep logs I submitted substantiate that my sleep time, average circadian rhythm, ~~and~~ hypersomnolence, and other measurements grew worse. Pl. Exs. 12 & 13. Good faith would have only led to a conclusion that because my sleep disorders worsened, I remained Totally Disabled as defined by the policy and am not capable of returning to consistent full-time employment.

~~153.~~182. RSLI's "termination and appeal rejection letters, which were based greatly on two deeply flawed 'peer reviews' [by Drs. Brodner and Jiva] (without ever sending Lucas to a circadian rhythm sleep disorder specialist for independent exam as would have been appropriate procedure), fail to comprehend that Non-24 and hypersomnolence significantly affect our ability to carry out most routine activities – including work. Being able to go to sleep and wake up around the same time every day is the most basic and fundamental of all routine human activities. In fact, it is the foundation upon which any and all other routines can be built. Having Non-24 plus hypersomnolence mean this foundational aspect of life, which is wholly taken for granted as automatic by nearly everyone, is wholly unattainable for both Lucas and me. We can't have routine activities because our brains are incapable of routine altogether." Pl. Ex. 21.

~~154.~~183. "Bad faith requires more than mere negligence; examples include lack of diligence, purposeful failure to perform, and interference with the other party's ability to perform."

*Camarda*, quoting from *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013). "Fair dealing means reasonable conduct that is not arbitrary and capricious." *Id.*

~~155.~~184.**ERISA REQUIRES DEALING IN GOOD FAITH:** Defendant RSLI ~~must~~ should not have~~not~~ arbitrarily refused to credit my ~~a claimant's~~ reliable evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003).

~~156.  Where significant procedural deficiencies occur and the plans' decision terminates benefits previously granted, the Court may order those benefits be reinstated. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 697 (7th Cir. 1992).~~

185.  Defendant RSLI acted in bad faith by unreasonably terminating my benefits with only a one-month notice. It should have continued to pay my benefits pending appeal since it had no evidence to support ~~the company's~~its conclusion that my medical conditions had~~ve~~ improved enough to where I was capable of returning to full-time work on a consistent basis.

~~157.~~

**Count III: Intentional Infliction of Emotional Distress as Against All Defendants**

~~158.~~186.As part of reviewing bad faith by an insurance company under ERISA and 42 Pa. C.S. § 8371, the Court shall consider other torts that, taken as whole, show a pattern of conduct toward the insured that is not acting in good faith and with fair dealing.

~~159.~~187.Although 42 Pa. C.S. § 8371 only applies to insurance companies, general common-law torts apply as to the misconduct by Defendants Drs. Brodner and Jiva.

~~160.~~188.A tort is defined as a private wrong or injury done to person or property for which a legal remedy is afforded. A tort arises where there is: 1) a duty of due care; 2) a breach of that duty; 3) a legally protected injury; and 4) a causal relationship between that injury and the action such that the action ""proximately caused" "the injury.

161.189. For civil tort cases, the standard of proof is preponderance of the evidence. Preponderance of the evidence means that it is more likely than not that the defendant is legally responsible for the plaintiff's injuries.

162.190. Intentional infliction of emotional distress occurs when a defendant acts and the conduct: 1) is outrageous; 2) is taken for the purpose of causing the victim emotional distress so severe that it could be expected to adversely affect mental health; and 3) causes such distress.

163.191. Mental suffering is an emotional response to an experience that arises from the effect or memory of a particular event, occurrence, pattern of events, or condition. Emotional distress can usually be discerned from its symptoms (i.e. anxiety, depression, suicidal ideation or attempt, loss of ability to perform tasks, or physical illness).

164.192. "The tort of IIED has three elements: '(1) extreme and outrageous conduct … that (2) intentionally or recklessly (3) caused [the plaintiff] severe emotional distress.'" *Tolson v. The Hartford Financial Services Group, Inc.,* No. 16-440 (D.D.C. 2016), quoting from *Newmyer v. Sidwell Friends Sch.,* 128 A.3d 1023, 1037 (D.C. 2015).

165.193. The D.C. Court of Appeals has held that a plaintiff may recover for emotional distress where the defendants have breached a duty to avoid inflicting such distress based upon a professional obligation to care for plaintiff's well-being or due to some type of relationship between defendant and plaintiff that necessarily implicates plaintiff's well-being. *See Hedgepath v. Whitman Walker Clinic.,* No. 07-CV-158 (D.C. 2011).

166.194. In this case, all three defendants had a professional obligation to care for my well-being because I am disabled. I and received long-term disability benefits from Defendant RSLI and the Social Security Administration for nearly eight years to compensate for that disability before they were improperly terminated.

167.195.Defendants Drs. Brodner and Jiva also had a relationship with me that implicates my well-being because they were tasked with professionally evaluating my medical records and determining whether there was any cause to terminate my disability benefits.

168.196.Despite there being no such evidence, Defendants Drs. Brodner and Jiva breached their duty to avoid inflicting emotional distress on me by writing reports full of falsehoods concluding I am no longer disabled, without any ~~substantial~~ evidence to support their findings. Pl. Exs. 7 & 9. *See also* my discussion of their falsehoods and unsupported conclusions at Pl. Exs. 8 & 10. *See also* my complaints filed against them with the medical licensing authorities in Florida and New York at Pl. Exs. 21 & 22.

197.  The "peer reviews" issued by Defendants Drs. Brodner and Jiva (without ever meeting with me or even speaking with me on the phone) were completely contradicted by the IME report written by Dr. Sambandam: "Mr. Wall cannot work in a full-time capacity from 11/10/2019 onward. On review of his sleep logs, his condition is clinically worsening and it is unlikely he will be ab le to function in a work capacity in the future." Pl. Ex. 18.

169.198.All defendants are aware, through reviews of my medical records, that I have a long history of mental illness including Bipolar II Disorder and Generalized Anxiety Disorder. They are aware I was hospitalized after a suicide attempt in August 2016 and have suffered numerous other episodes of major depression and suicidal ideation.

170.199.I incorporate ~~into this Amended Complaint the allegations~~ all arguments concerning~~of~~ Defendant RSLI's intentional infliction of emotional distress ~~against Defendant RSLI as detailed in my~~ from my April 30, 2020, appeal letter into this Second Amended Complaint. Pl. Ex. 8.

200.  ~~My allegations of intentional infliction of emotional distress also apply to Defendants Drs. Brodner and Jiva, who wrote false reports reviewing my medical records that they knew would lead to the termination of my long term disability benefits. *See* my comments concerning Drs.~~

~~Brodner and Jiva's reports marked up at Pl. Exs. 7 & 9 as well as arguments made to RSLI at Pl.~~ ~~Exs. 8 & 10.~~ I incorporate all arguments concerning Defendant Dr. Brodner's intentional infliction of emotional distress from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

~~171.~~201. I incorporate all arguments concerning Defendant Dr. Jiva's intentional infliction of emotional distress from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

202.  Emotional distress I have suffered as a result of all defendants' actions include an episode of suicidal depression from Aug~~ust.~~ 18-22, 2020.

203.  "Recently, the termination of Lucas' long-term disability benefits that RSLI paid him from mid-2012 to February 2020 have thrust him back into despair. He's already lost almost everything in his life, and now he's been blindsided with even more loss from the little he has left. Lucas has been crushed this year by an inability to pay off credit-card debt because of the many thousands of dollars [RSLI] withheld from him [due to Dr. Brodner and Jiva's reports] as well as an inability to move ahead with purchasing a condominium in Washington because, although he's qualified for two District of Columbia first-time-homebuyer programs for the poor and disabled, [the] decision to terminate his benefits has made him unable to qualify for a mortgage under such programs (there is a minimum income required to purchase)." Pl. Ex. 23.

~~172.~~204. "This despair is wholly warranted, as he has literally no medical recourse left to pursue – a statement I make based upon the explicit advice given to me from two highly specialized and renowned doctors I've had the privilege to see since I moved to Germany with my wife five years ago. Only a few weeks ago, this despair drove Lucas into another suicidal crisis so worrisome that my wife and I are presently making arrangements for him to come stay with us in Germany for awhile so we can look after him." *Id.*

173.205. All defendants were aware that suddenly terminating long-term disability benefits I had received for eight years, cutting off half my income with only a one-month notice, would likely cause me to suffer extreme emotional distress.

174.206. All defendants engaged in extreme and outrageous conduct that intentionally or recklessly caused me to suffer extreme emotional distress. *See Cooke-Seals vs. District of Columbia,* 973 F. Supp. 184, 188 (D.D.C. 1997).

175.207. Courts have held that an action that violates public policy might qualify as intentional inflection of emotional distress. *See Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C. 1984).

176.208. The public policy of the United States and the District of Columbia is to protect the rights of people with disabilities. *See* Americans with Disabilities Act and D.C. Human Rights Act, *et. al.*

177.209. The public policy of the United States is to ensure independent and impartial decisionmaking on ERISA claims.

178.210. Defendant RSLI violated federal regulations concerning independent and impartial decisionmaking: "In the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits." 29 CFR § 2560.503-1(b)(7).

179.211. All three defendants are held to higher standards of behavior when they are dealing with individuals "who it is reasonable to assume are particularly susceptible to emotional distress." *Drejza v. Vaccaro*, 650 A.2d 1308, 1313 (D.C. 1994).

~~180.~~212. In such a situation, "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." *Id.*, quoting *Restatement (Second) of Torts*, § 46, comment (f).

~~181.~~213. Several cases recognize that a defendant's breach of contract may give rise to allegations of intentional, tortious infliction of emotional distress. *See*, e.g., *Asunscion v. Columbia Hosp. for Women,* 514 A.2d 1187, 1990 n. 3 (D.C. 1986); *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37-38 (D.C. 1982); and *Washington v. Government Employees Ins. Co.*, 769 F. Supp. 383, 388 n. 8 (D.D.C. 1991). These cases ~~certainly~~ provide that a tort action could proceed ~~with~~ when a breach of contract "merge[d] with, and assume[d] the character of the tort of intentional infliction of severe emotional distress." *Sere* at 37.

**Count IV: Negligence as Against All Defendants**

~~182.~~214. Negligence is a legal standard that means the party responsible for an injury failed to behave as a reasonably prudent person would under the same circumstances.

~~183.~~215. Negligence is the term used by tort law to characterize behavior that creates unreasonable risks of harm to persons and property. A person acts negligently when his behavior departs from the conduct ordinarily expected of a reasonably prudent person under the circumstances.

~~184.~~216. To show negligence, a plaintiff must prove: A) The defendant owed the plaintiff a reasonable duty of care, an obligation to the plaintiff recognized by law and/or contract; B) The defendant breached its duty of care. A breach refers to a failure to uphold the duty of care by some act or omission. That failure is typically the result of negligence, but it could also be because of recklessness or intentional wrongdoing; C) The breach caused injury to the plaintiff; and D) Because of the breach and injury, the plaintiff suffered damages.

185.217. ERISA does not pre-empt state—law negligence and negligent misrepresentation claims. *Padeh v. Zagoria*, 900 F. Supp. 442, 488 (S.D. Fla. 1995).

218. "[I]t is evident that while ERISA's preemption clause is rather broad, it is not all-encompassing. As noted by the decisions above, courts have consistently determined that some state laws do not 'relate to' an ERISA plan." *Id*.

219. "Whether a particular state law 'relates to' an ERISA plan is by no means a simple issue to resolve. 'Relates to' has potentially broad ramifications and courts must be careful not to exclude legitimate causes of action simply because an ERISA plan is somehow tied into the facts of a particular case. Thus, it is paramount that courts look to the Congressional intent behind the preemption clause." *Id.*

186.220. NIn any case, negligence should d be considered in parallel with bad faith, which is covered by the Pennsylvania statute regulating insurance. 42 Pa. C.S. § 8371.

187.221. Negligence is also a stand-alone tort demonstrating a failure to behave with the level of care that someone of ordinary prudence would have exercised under the same circumstances.

188.222. Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm.

189.223. "In the District of Columbia, 'a claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach.'" *Tolson v. The Hartford Financial Services Group, Inc.,* No. 16-440 (D.D.C. 2017), quoting from *Poola v. Howard Univ*., 147 A.3d 267, 289 (D.C. 2016) (alternation and citation omitted).

190.224. Typical recoverable damages in a negligence claim are enumerated in D.C. Civil Jury Instruction No. 13-1. They include (as relevant to this case): Any emotional distress that the plaintiff has suffered, any emotional distress that the plaintiff might suffer in the future, any inconvenience the plaintiff has experienced, and any inconvenience the plaintiff might experience in the future, and any loss of earnings (benefits) incurred by the plaintiff..

191.225. **NEGLIGENCE BY RSLI:** Defendant RSLI owed a reasonable duty of care to ensure it continued my long-term disability benefits as provided by the policy since I remain Totally Disabled.

192.226. By terminating my benefits in as of February January 2020 in violation of the insurance policy and then denying my appeal July 29, 2020, Defendant RSLI breached its duty of care.

193.227. Defendant RSLI's negligence in improperly terminating my benefits was the direct and proximate result of my injuries and damages, i.e. loss of pre-tax income in the amount of $2,127.71 per month for March to August 2020, accumulation of credit-card interest I could not pay as a result of the loss of benefits due, and depriving me of the ability to move forward with purchasing a home this year utilizing two District of Columbia assistance programs for the poor and disabled.

194.228. **NEGLIGENCE BY DRS. BRODNER & JIVA:** Defendants Drs. Brodner and Jiva owed a reasonable duty of care to ensure they performed factually accurate, independent "peer reviews" of my medical records under contract to Defendant RSLI. A doctor owes a duty of care to treat any patient according to the standards of the medical profession, even one assigned to it for evaluation by an insurance company or other medical provider.

229. I incorporate all arguments concerning Dr. Brodner's negligence from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

230. I incorporate all arguments concerning Dr. Jiva's negligence from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

~~195. The law acknowledges that there are certain medical standards that are recognized by the profession as being acceptable medical treatment by reasonably prudent healthcare professionals under like or similar circumstances. This is known as the standard of care. A patient has the right to expect that healthcare professionals will deliver care that is consistent with these standards. If it is determined that the standard of care has not been met, then negligence might be established.~~

~~196. By submitting to Defendant RSLI reports full of falsehoods and ignoring critical records such as my sleep logs and data graphs, Defendants Drs. Brodner and Jiva breached their duty of care to submit a truly independent peer review with actual facts and medically supported conclusions. Pl. Exs. 7 & 9. I incorporate arguments made in Pl. Exs. 8 & 10 as to these two defendants' negligence.~~

~~197. Defendants Drs. Brodner and Jiva also breached their duty of care by failing to examine me in person or at least interview me by telephone before issuing conclusions about my the severity of my medical impairments.~~

~~198.~~231. Defendants Drs. Brodner and Jiva "in no way explained~~[]~~ how [their] conclusions are rationally related to the medical evidence. … It is difficult to credit a decision as 'reliable' when the reviewer fails to link his conclusions to the patient's medical history." *Marcin v. Reliance Standard Life Ins. Co.*, No 16-7125 (D.C. Cir 2017).

~~199. Defendants Drs. Brodner and Jiva's negligence in submitting reports full of errors, misstatements of the facts, and medically unsupported determinations led to Defendant RSLI terminating my benefits, therefore contributed to the direct and proximate result of my injuries and damages, i.e. loss of pre-tax income in the amount of $2,127.71 per month, accumulation of credit card interest I could not pay as a result of the loss of benefits due, and depriving me of the ability to move forward with purchasing a home this year utilizing two District of Columbia assistance programs for the poor and disabled.~~

**Count V: Harassment as Against Defendant RSLI**

~~200.~~232. Harassment is generally defined as a course of conduct which annoys, threatens, intimidates, alarms, or puts a person in fear. Harassment is unwanted, unwelcome and uninvited behavior that demeans, threatens, or offends the victim and results in a hostile environment for the victim.

201.233.I incorporate into this Second Amended Complaint the ~~allegations~~ arguments of harassment against Defendant RSLI as detailed in my April 30, 2020, appeal letter. Pl. Ex. 8.

**Count VI: Invasion of Privacy as Against Defendant RSLI**

202.234.Invasion of privacy is the intrusion into the personal life of another, without just cause, which can give the person whose privacy has been invaded a right to bring a lawsuit for damages against the person or entity that intruded. It encompasses workplace monitoring, Internet privacy, data collection, and other means of disseminating private information.

203.235.I incorporate into this Second Amended Complaint the ~~allegations~~ arguments of invasion of privacy against Defendant RSLI as detailed in my April 30, 2020, appeal letter. Pl. Ex. 8.

236. An insurance agency, even in connection with an ERISA plan, can be held liable for tortious invasion of privacy in connection with actions of investigators tasked with uncovering information regarding a claimant. *Dishman v. UNUM Life Ins. Co. of Am.,* 269 F.3d 974, 984 (9th Cir. 2001).

237. "California's common law tort remedy for an 'unreasonably intrusive' investigation that amounts to an invasion of privacy bears scant resemblance to the laws the Supreme Court has found violative of [ERISA's pre-emption clause]. By no stretch of the imagination can it be said to 'mandate employee benefit structures or their administration.' … Making ERISA administrators liable for investigations perpetrated by their agents 'which would be objectionable or offensive to the reasonable man' simply cannot be said to interfere with nationally uniform plan administration …" *Id.* at 982.

238. This tort claim does not depend on or derive from my claim for benefits in any meaningful way.

239. Pre-emption "does not occur … if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability. The fact that the conduct at issue allegedly occurred 'in the course of UNUM's administration of the plan' does

not create a relationship sufficient to warrant preemption. If that were the case, a plan administrator could 'investigate' a claim in all manner of tortious ways with impunity.'" *Id.* at 984.

~~204.~~240. "Though there is clearly some relationship between the conduct alleged and the administration of the plan, it is not enough of a relationship to warrant preemption. We are certain that the objective of Congress in crafting Section 1144(a) was not to provide ERISA administrators with blanket immunity from garden variety torts which only peripherally impact daily plan administration." *Id.*

**Count VII: Medical Malpractice as Against Defendants Drs. Brodner & Jiva**

~~205.~~241. Due to the immense trust we are forced to place in healthcare professionals, medical malpractice is perhaps the most disturbing form of personal-injury claim. Medical malpractice occurs when a patient is harmed by a doctor (or other medical professional) who fails to competently perform his or her medical duties.

242. I incorporate all arguments concerning Dr. Brodner's medical malpractice (aka gross incompetence) from my Florida Department of Health complaint into this Second Amended Complaint. Pl. Ex. 21.

243. I incorporate all arguments concerning Dr. Jiva's medical malpractice (aka gross incompetence) from my New York State Department of Health complaint into this Second Amended Complaint. Pl. Ex. 22.

~~206. Some of the most common forms of medical malpractice are failure to properly diagnose a patient's condition; misreading or misinterpreting lab results and/or medical records from other providers; and failing to properly evaluate a patient when assigned by an insurance company or other medical provider.~~

244. "These doctors [Brodner and Jiva] are not specialists in circadian rhythm sleep disorders, and their ignorance of CRSD's is glaringly apparent. They committed what is called 'gaslighting' – when

doctors fail to make a good-faith effort to understand a patient's 'invisible diseases.' Attachment

42. This is considered medical malpractice." Pl. Ex. 23.

207. 245. A An injured patient must prove the following four elements to be successful in a medical

malpractice claim: 1) The doctor owed the patient a duty of care; 2) The doctor breached the duty

to provide adequate care owed to the patient; 3) The doctor's action caused or contributed to the

patient's injury; and 4) The patient suffered an injury that resulted in damages.

246.   Defendant Dr. Brodner claims to be a sleep specialist, but a check of online records indicate he

is NOT certified as such by the American Board of Sleep Medicine. Ex. 15. This raises the question

of whether Dr. Brodner is practicing medicine fraudulently by misrepresenting his qualifications.

208.  Defendant Dr. Brodner is not certified as a sleep specialist by the American Board of Sleep

Medicine. Pl. Ex. 15.

209.  Any time a doctor or another care provider fails to provide an acceptable standard of care or

deviates from the acceptable protocols, and the patient suffers as a result, it could potentially

support a medical malpractice case.

210.  A missed diagnosis occurs when the patient does not get a diagnosis despite having symptoms

that another doctor with the same training would have likely correctly identified. A missed

diagnosis may occur because of carelessness, because a doctor ignored test results, or because

someone misread a report from the lab. A missed diagnosis or delayed diagnosis can be very

serious if it leads to an insurance company denying or terminating benefits.

211. 247. Negligence is at the center of all medical malpractice cases. I incorporate into this count all

points arguments related to negligence asserted against Defendants Drs. Broder and Jiva above

under Count IV.

212.  A doctor must have been negligent in connection with a patient's treatment, diagnosis, and/or

evaluation sent to an insurance company or other third party that hired the doctor to review

~~medical records. A patient and/or claimant must be able to show that the doctor caused him harm~~

~~in a way that a competent doctor, under the same circumstances, would not have.~~

~~213.~~248.A doctor's negligence must have caused an injury, i.e. denial of continued long-term disability

benefits by an insurance carrier and severe emotional distress. The patient must show that it is

"~~"~~more likely than not"~~"~~ that the doctor's incompetence directly caused the injury.

~~214.~~249.The injury must have led to specific damages, i.e. loss of ~~your~~ continued long-term disability

benefits, interest payments on credit-card debt, inability to move forward with a home purchase,

emotional distress, pain and suffering, mental anguish, etc.

250.  Failure to diagnose appropriate medical conditions that cause disability: If a competent doctor

would have discovered the patient's illness or made a different diagnosis, directly or to an

insurance carrier, which in turn would have led to a better outcome than the one actually

achieved, then the patient has a viable medical malpractice claim.

~~215.~~

~~216.~~251.To hold a doctor liable for medical malpractice, a person must have some form of a

doctor/patient relationship. A person likely has a doctor/patient relationship with a variety of

providers that treat him, even if they are not his primary-care physician. This includes any doctors

that evaluate one's medical records for an insurance company to decide if he is entitled to

healthcare, disability, and other benefits.

~~217.~~252."In medical-malpractice cases, a physician-patient relationship is a prerequisite to the

existence of any duty. *St. John v. Pope,* 901 S.W.2d 420, 423 (Tex. 1995) … To establish such a

relationship, the physician need not have direct physical contact with the patient. *St. John*, 901

S.W.2d at 424. Indeed, a physician-patient relationship may be established at the express or

implied consent of the physician. *Id.* at 423." *Ortiz v. Glusman*, 334 S.W.3d 812, 817 (Tex. App.

2011).

218.253. In this case, Defendants Drs. Brodner and Jiva expressed consent to a physician/patient relationship with me when they agreed to receive thousands of dollars of compensation from Defendant RSLI to evaluate my medical records and conclude recommend whether or not I remain Totally Disabled.

219.   When a doctor fails to follow standard protocols or ignores common procedures, they violate their duty of care. Doctors are expected to act in the same way and provide the same care as others with similar experience and training would.

220.   Doctors owe a duty of care not to accept a patient for treatment or evaluation of medical records if they do not possess an expertise in the patient's rare disorders.

221.   "Rare diseases are unknown to most healthcare professionals; only centers of expertise are qualified to accurately diagnose and treat individuals suffering from rare diseases." Pl. Ex. 14.

222.   "The assessment of [Plaintiff] LEW's case by anyone other than experts in the field of circadian rhythm disorders/N24SWD and/or published authors in the field of N24SWD is medically irresponsible." *Id.*

254.   There must be a link between the doctor's negligent behavior and the patient's injury. In this case, the negligence of Defendants Drs. Brodner and Jiva led to Defendant RSLI terminating my disability benefits, which has caused numerous injuries to me as cited above.

223.

255.   Dr. Brodner practices in Florida. "The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102.

224.

225.256. Dr. Jiva practices in New York. In that state, "To establish a *prima facie* case of liability in a medical malpractice action, a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury (*see Gibson v. D'Amico*, 97 A.D.2d 905; see also *Gross v. Friedman*, 138 A.D.2d 571, affirmed 73 N.Y.2d 721; *Kelly v. Lieber*, 261 A.D.2d 441)." *Berger v. Becker*, 272 A.D.2d 565 (N.Y. App. Div. 2000).

226.257. In general, medical malpractice claims in New York are governed principally by the 1985 Medical Malpractice Reform Act. The Act is comprised of numerous procedural and substantive revisions and additions to several of the state's Consolidated Laws, including the Public Health Law, Civil Practice Law & Rules, Education Law, Insurance Law, and Judiciary Law. The specific statutory provisions of the Act are thus scattered throughout the foregoing Consolidated Laws.

258. There are four basic elements of a compensable medical malpractice claim in New York: 1) The defendant is a healthcare provider who owed the injured patient a legal duty of care; 2) The healthcare provider's actions deviated from or fell below the accepted standards of medical practice thereby breaching the legal duty of care owed; 3) The healthcare provider's breach of the required standards of medical practice proximately caused or contributed to causing injury to the patient; and 4) The injured patient suffered damages because of the injuries. *See Gross v. Friedman*, 73 N.Y.2d 721 (N.Y. 1988) and *Stukas v. Streiter*, 83 A.D.3d 18, 23 (N.Y. App. Div. 2011).

259. Defendant Dr. Jiva's professional misconduct by a physician matches several definitions contained in New York Education Law § 6530 including: (4) Practicing the profession with gross negligence; (6) Practicing the profession with gross incompetence; (21) Willfully making or filing a false report; and (24) Practicing or offering to practice beyond the scope permitted by law, or accepting and performing professional responsibilities which the licensee knows or has reason to know that he or she is not competent to perform.

227.

## V. PRAYER FOR RELIEF

WHEREFORE, I request this Court grant the following relief:

A.   Order Defendant RSLI to pay the long-term disability benefits I am entitled to, and have not received, from March 2020 to present pursuant to ERISA. (Count I)

B.A.Award pre-judgment interest on the amount of my RSLI benefits due from March to August 2020 that were not paid until September 2020 to final judgment in anthe amount equal to the prime rate of interest (currently 3.25%) plus 3% (for a current total of 6.25%) pursuant to 42 Pa. C.S. § 8371. This amount is $215.91. Pl. Ex. 19. In the alternative, award interest in the amount of 6% pursuant to D.C. Code § 28–3302(a). (Counts I & II)

C.B.Assess all costs and attorney's fees (if I later hire an attorney during this litigation) against Defendant RSLI pursuant to ERISA and 42 Pa. C.S. § 8371. If I elect to continue proceeding *pro se*, RSLI should pay fees to me in lieu of an attorney for the time I have spent litigating this matter. (Counts I & II)

D.C.   Order Defendant RSLI to pay my long-term disability benefits until I reach the retirement age of 67, as required by the policy, pursuant to ERISA, barring discovery of any substantial evidence that: 1) I have returned to work on a consistent full-time basis; or 2) a scientific advancement concerning the treatment of Non-24-Hour Sleep/Wake Disorder and/or Hypersomnolence Disorder has led to achievement of a cure for my sleep disorders, as certified by a physician specializing in Circadian Rhythm Sleep Disorders who has treated me successfully based on the new scientific advancement. (Count I)

E.D.Enjoin Defendant RSLI from conducting any further examinations of my claim for long-term disability benefits, except to determine whether any of the two exceptions listed in ¶ CD above

exist, since my conditions are medically recognized as chronic, life-long, and untreatable – facts ~~already~~ accepted by RSLI after ~~two~~ the three ~~independent medical exam~~IME's performed in 2016, ~~and~~ 2017, and 2020. ~~to approve and sustain my claim.~~ (Count I)

~~F.~~E. Enjoin Defendant RSLI, as part of any probe of a cure described in ¶ ~~C~~D(2) above, from utilizing a service known as "peer review" whereby a physician looks at my medical records and issues a report without ever meeting with me or even speaking with me on the phone. (Count I)

~~G.~~F. Enjoin Defendant RSLI from sending me to any physician for an "independent medical exam" or similar procedure unless it has first obtained and shared with me substantial evidence that shows the likelihood of one or both exemptions listed in ¶ ~~C~~D above. (Count I)

~~H.~~G. Award me compensatory damages from all three defendants for the interest I've had to pay on credit-card accounts from March to September 2020 ~~to final judgment~~ as a direct result of the improper termination of my long-term disability benefits. (Counts II-VII)

~~I.~~H. Also award me compensatory damages from all three defendants in an amount equal to treble one year's long-term disability benefits ($25,532.52 X 3 = $76,597.56 for each defendant, for a total of $229,792.68) for the financial and emotional distress, mental anguish, pain and suffering, inconvenience, as well as loss of enjoyment of life that I have suffered because of their actions in bad faith, intentional infliction of emotional distress, negligence, harassment, invasion of privacy, and medical malpractice – including my inability to move forward with purchasing a home this year using two District of Columbia assistance programs for the poor and disabled. (Counts II-VII)

~~J.~~I. Award me punitive damages as authorized by 42 Pa. C.S. § 8371 and other laws against all three defendants. Specifically, I demand: Treble damages ($76,597.56) against Defendant RSLI for Counts II-VI, treble damages ($76,597.56) against Defendant Dr. Brodner for Counts II, III, IV, and VII, and treble damages ($76,597.56) against Defendant Dr. Jiva for Counts II, III, IV, and VII, for a total of ~~—~~$229,792.68.

K.J. Grant other declaratory and injunctive relief as may be necessary to ensure that Defendant RSLI

acts in good faith in continuing to pay my long-term disability benefits until I turn 67 or return to

consistent full-time employment, pursuant to the policy terms and enforceable under ERISA.

L.K. Grant such other and further relief as the Court may deem just and proper under the

circumstances.

I demand a jury trial on any issue triable of right by a jury pursuant to Fed. R. Civ. P. 38. Although jury

trials are not typically permitted for ERISA claims, this is a hybrid claim brought under ERISA and other

(state) laws. Hybrid claims joined with an ERISA action may be tried before a jury. *Stewart v. KHD Deutz*

*of Am. Corp.*, 75 F.3d 1522, 1528 (11th Cir. 1996).

Respectfully submitted this 24th14th day of September 2020.

*Lucas Wall*

Lucas Wall, plaintiff
435 10th St., NE
Washington, DC 20002
Telephone: 202-351-1735
E-Mail: Lucas.Wall@yahoo.com